ARTHUR H. HAFEMAN, APPELLEE, V. GEM OIL COMPANY ET AL., APPELLANTS, IMPLEADED WITH DEAN TERRILL ET AL., APPELLEES.
ARTHUR H. HAFEMAN, APPELLEE, V. GEM OIL COMPANY ET AL., APPELLEES, IMPLEADED WITH DEAN TERRILL, APPELLANT.
ARTHUR H. HAFEMAN, APPELLANT, V. GEM OIL COMPANY ET AL., APPELLEES.

80 N. W. 2d 139

Filed December 28, 1956. Nos. 34017, 34018, 34023.

*Martin, Davis & Mattoon,* for appellants.

*Torgeson, Halcomb & O'Brien* and *John D. Knapp,* for *appellee.*

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

BOSLAUGH, J.

This action seeks a determination and adjudication of the rights of the parties to royalty of the landowner payable by the terms of the base oil and gas lease of two noncontiguous quarter sections of real estate owned

by Arthur H. Hafeman, an accounting of the royalty he claims is due him because of the production of oil from the land, a judgment in his favor for the amount thereof, and general equitable relief.

The parties are numerous and will, when appropriate, be designated herein as follows: Arthur H. Hafeman, plaintiff in the district court, as appellee; and the defendants in that court, including Dean Terrill who is an appellee in case No. 34017, as appellants. The parties do not have a common status or identical and equal interests. They may be classified as follows: Appellee, who owned the land when the lease thereon was executed and delivered and who has a mineral interest therein; appellants who own only a mineral interest in one quarter section of the land will be sometimes referred to herein as mineral owners; appellants who own only a working interest in the lease as to the one quarter section of the land will be sometimes referred to herein as leasehold owners; Gem Oil Company and Dean Terrill are individually mineral owners and they each have a working interest in the lease. They will be sometimes referred to respectively as Gem Oil Company and Terrill.

The pleadings are quite voluminous and involved. There is no controversy concerning them. They join issue on questions pertinent to the litigation. Additional statements as to their contents will be made when appropriate. The parties concede, and the record verifies the correctness of their conclusion, that there is no issue of fact in the case. The controversy relates to the interpretation, meaning, and significance of the proof which principally consists of instruments and writings.

Appellee was the owner of the northeast quarter of Section 23 and the southeast quarter of Section 12, Township 14 North, Range 55 West, Kimball County, Nebraska. The land in Section 23 is referred to as Tract 1 and the land in Section 12 as Tract 2. Appellee

and his wife on October 1, 1949, executed and delivered an oil and gas lease of the land to Magnolia Petroleum Company and thereby leased the land to it for oil and gas exploration and production. The lease contained provisions for its assignment by either party, in whole or in part, and an entirety clause. The lease was filed for record in the office of the register of deeds of that county on December 2, 1949, and it was in force at all times important to this litigation.

The lessee by letter proposed a farmout and assignment of the base lease, to the extent it affected Tract 1, to Eddie Fisher. The proposal was accepted by him on March 16, 1954. The terms of it were that if he commenced the drilling of a well on a designated location and prosecuted it with due diligence to a depth sufficient to test certain formations or until production in paying quantities was obtained and completed the work in a specified time, the lessee would assign to Eddie Fisher the lease as to Tract 1. The letter concerned two leases and contained this language: "Reference is here made to said leases and the record thereof for this and all other purposes."

Appellee and his wife on April 12, 1954, conveyed by mineral deed to Eddie Fisher for a consideration of $4,000 an undivided ½ interest in and to the oil, gas, and other minerals in and under and that may be produced from Tract 1, subject to the oil and gas lease of October 1, 1949. This deed recites that it is the intention of the grantor to convey 80 mineral acres. The grantee in the deed was, by agreement acknowledged April 22, 1954, changed from Eddie Fisher to Gem Oil Company. Appellee and his wife on May 15, 1954, conveyed by mineral deed to Dean Terrill for a consideration of $2,500 an undivided ¼ interest in and to the oil, gas, and other minerals in and under and that may be produced from Tract 1, subject to the oil and gas lease of October 1, 1949. This deed recites it was the inten-

tion to convey and transfer approximately 40 mineral acres out of said tract.

The commercial production of oil was established May 15, 1954, by the test well drilled on Tract 1 in accordance with the farmout letter. The lessee of the base lease assigned it as to Tract 1 to Eddie Fisher on June 9, 1954. In the period of May 8, 1954, to June 22, 1954, both inclusive, he assigned to other persons all the leasehold interest in Tract 1 which he acquired from the original lessee.

The Gem Oil Company was the lease operator. It caused a division order, dated June 15, 1954, to be prepared. It was directed to the oil company. It was signed by the owners of royalty and working interests, including appellee. It described 32 separate fractional interests. The interest of appellee was therein designated as "1/4 of 1/8 R.I." The interest of Gem Oil Company was designated as "3/32 of 1/8 R. I." and "67/128 of 7/8 W. I." The interest of Dean Terrill was described as "1/4 of 1/8 R. I." and "1/64 of 7/8 W. I." The interest of Dean Terrill, Trustee, was described as "1/16 of 7/8 W. I." Appellee by the terms of the division order certified and guaranteed that he was the owner of "1/4 of 1/8 R. I." of the oil produced from Tract 1 and he authorized Gem Oil Company to receive all money from oil produced therefrom according to instructions set forth in the order. The amount received from the sale of oil was specified to be paid to the parties designated therein severally in the proportions named. The order provided it could be terminated by any party in interest by giving 30 days' notice. The division order was not for or to the purchaser of the crude oil produced because of the lease. There is no proof that anyone was misled or was induced to act by the fact that it represented the interest of appellee as appellants claim it should be. The division order was prepared by the Gem Oil Company, addressed to it, and it was for that company. The fractional interests of the owners and

the fractional breakdown in the division order were determined by the representatives of Gem Oil Company. It did not secure and had no division order title opinion. The crude oil from Tract 1 was from the time of first production until April 5, 1955, sold to Western Crude Marketers. The total purchase price thereof was paid by it to and was distributed by Gem Oil Company. George Fisher, the secretary and treasurer of that company, actually handled the sale of the crude oil.

The Gem Oil Company made a detailed monthly oil-run report to appellee which exhibited his interest in the production as set forth in the division order and the net royalty due him on that basis. He accepted and retained payments made to him monthly as royalty due him as shown by the division order from the first production to April 5, 1955, in the total sum of $12,463.69. This case was commenced March 30, 1955. A royalty payment of $839.50 was made to him April 27, 1955, and the last royalty paid him was May 27, 1955, in the sum of $121.65.

Appellee signed a statement, dated June 24, 1954, and addressed to Magnolia Petroleum Company, as follows: "Mr. Steinauer was her (here) to see me in regard to the ½ interest purchased for the Gem Oil Co. on the N. E. ¼-23-14-55. I am willing to sign any papers stating that this meets my approval." A writing designated STIPULATION OF INTEREST AND AGREEMENT, prepared by the Gem Oil Company, was executed during the month of July 1954 by appellee, his wife, Gem Oil Company, and Dean Terrill. It was contemplated that Magnolia Petroleum Company should also execute it. The writing expressly provided it should not be binding on the Magnolia Petroleum Company until it was executed by Hafeman, his wife, Dean Terrill, and Gem Oil Company, recorded in the proper records of Kimball County, and after a certified or photostatic copy of the record of the instrument was delivered to Magnolia Petroleum Company. The writ-

ing was sent to the Magnolia Petroleum Company. It did not sign but returned the writing with the information that the management of the company required the signatures of all working-interest owners in addition to those who had signed it. This writing recited that the mineral deeds to Gem Oil Company and Dean Terrill were subject to the base lease given Magnolia Petroleum Company; that the lease provided that the royalties accruing thereunder should be treated as an entirety; that it was the desire of the parties to the deeds that the royalty conveyed by them should apply only to the production from the tract covered by the deeds; and that the grantees in the deed should receive their respective share as set forth in the deeds of royalties payable under the lease on production from the tract described in the deeds. The writing stated that it was agreed by the parties thereto that the interest conveyed to the grantees in the mineral deeds in and to royalties payable under the lease was from production from the specific tract described in the mineral deeds and from no other tract covered by the oil and gas lease; that nothing contained in the writing should be construed as modifying or changing any provision of the oil and gas lease other than to require the lessee to separately account to the grantors in the mineral deeds for the royalties payable under the oil and gas lease on production from the specific tract described in the mineral deeds and to the extent of the interest acquired by the grantees in said tract; and that by virtue of the mineral deeds the vendees therein "are entitled to receive their proportionate share of the rentals that might be paid under the terms and provisions of said Oil and Gas Lease." When this writing was returned to the Gem Oil Company by the Magnolia Petroleum Company on August 10, 1954, it was placed in its files and nothing further was done with it. At the time of the trial it was traced to the files of the Gem Oil Company but it could not be found there and the original of it was not produced at the trial.

A second writing designated STIPULATION OF IN-
TEREST AND AGREEMENT was prepared by Gem Oil
Company and between September 1, 1954, and October
19, 1954, it was signed by appellee, his wife, Gem Oil
Company, Dean Terrill, and the leasehold owners. It
was sent by Gem Oil Company to Magnolia Petroleum
Company on October 25, 1954, for execution. It returned
it on November 8, 1954, because it was not signed by
the royalty owners. A supplement to the writing was
made and signed by other persons designated royalty
owners, not including appellee, between November 24,
1954, and December 20, 1954. The instrument was then
sent by the Gem Oil Company to Magnolia Petroleum
Company on December 24, 1954, for its execution. It
was returned unsigned by the Magnolia Petroleum Com-
pany with comments concerning it, including the fol-
lowing: "The instrument furnished us which we are
returning herewith, excepts and removes from the en-
tirety clause the three-fourths interest in the NE¼ of
Section 23, as covered by the two mineral deeds re-
ferred to, but the remaining one-fourth interest in said
quarter, as well as the entire SE¼ of Section 12, re-
mains under the entirety clause. This would have the
practical effect of leaving this royalty in a confused
state, particularly so if production is obtained on the
SE¼ of Section 12." This instrument was received by
the Gem Oil Company and placed in its files. Nothing
further was done with it and it was abandoned. It was
traced to the files of the Gem Oil Company at the trial.
It could not be found there and the original was not
produced at the trial.

The Gem Oil Company was a family organization.
Ruth Fisher, the wife of Eddie Fisher, was its presi-
dent; Eddie Fisher was its vice president and it may
fairly be said that he was the alter ego of the corpora-
tion; and George Fisher was its secretary and treasurer.
The three persons named as officers were the only
stockholders of the company. They or any of them did

not attend or testify at the trial. Dean Terrill was present at the trial but was not used by appellants as a witness. An employee of Magnolia Petroleum Company testified that he talked to appellee in June 1954 concerning his sale of minerals in Tract 1. He said he asked appellee if he intended to sell the mineral rights under Tract 1 and he answered that that was the agreement. This was the only person who talked with appellee concerning the sale of minerals so far as the record shows.

The gross production from Tract 1 to April 5, 1955, was 169,361.9 barrels of oil. The gross receipts from the sale thereof were $436,008.74. Appellee was paid as royalty $12,463.69. Appellee has made no conveyance specifically describing Tract 2 since the execution of the base lease. There has been no production from any well drilled on Tract 2.

Appellants do not assail the detailed findings of fact made by the trial court. The court stated numerous conclusions of law many of which are excepted to by appellants. The number and length of the conclusions of law prevent them from being set out. The substance of some of them is as follows:

The evidence does not show that mutual mistake of fact caused the execution and acceptance of the mineral deeds or equitable grounds for their rescission or reformation. The language of each of the deeds is clear and unambiguous and extrinsic matters may not be considered to change the clear meaning of them. The grantees in the deeds were charged with notice of the provisions of the base lease by the recording of it and by the terms of the deeds.

The legal effect of the entirety clause in the base lease is that the royalty provided for therein is vested in the mineral owners of the land leased in the proportion that the mineral interest owned by each bears to the entire leased acreage of 320 acres. Gem Oil Company and Terrill, in negotiating for and securing the mineral

deeds, failed to take in account the legal effect of the entirety clause in the base lease notwithstanding they were each charged with notice of it and the meaning thereof. The deeds vested mineral ownership in the respective grantees in the exact terms of each of the deeds but during the term of the base lease the right to royalties from the lands leased thereby is fixed by the provisions of the lease. Appellee is not estopped to make the claim stated in his petition in this case because there is no proof of any concealment or misrepresentation or any reliance thereon or change of position by any of the other parties owning mineral interests.

The interest of appellee in royalties accruing from production from any part of the leased premises is 200/320 or $\frac{5}{8}$. The interest of Gem Oil Company and its transferees is 80/320 or $\frac{1}{4}$. The interest of Terrill is 40/320 or $\frac{1}{8}$.

Appellee is entitled to receive as his share of royalty of production from the date it was first established to April 5, 1955, $\frac{5}{8}$ of $50,884.52 or $31,802.80 of which amount there has been paid to him $12,463.69, leaving a balance due and owing to him of $19,339.11 which balance, except $257.50, was paid to various royalty-interest owners in proportion to their several interests. Appellee is entitled to recover from the adverse parties named in paragraph 7 of his petition in this case who owned royalty interests in Tract 1 during the period of first production of oil therefrom to April 5, 1955, the sum of $19,081.70, with interest thereon at 6 percent per annum on the respective amounts of the royalty wrongfully paid to them and from the respective dates of the payment. The parties owning royalty interests last described are liable for the said payments in proportion to their respective ownership of royalty interests.

Appellee is the owner of and entitled to $\frac{5}{8}$ of the royalty accruing to April 5, 1955. If production is obtained during the term of the lease from Tract 2, the right to royalties is fixed in the parties in accordance

with the findings and judgment in this case.

The Gem Oil Company and other appellants owning only a working interest in the leasehold estate with reference to Tract 1 are not as such liable to appellee for the amount of royalty payments erroneously made to the royalty-owner appellants between the first production and April 5, 1955.

The judgment rendered in this case is in accordance with the findings of fact and conclusions of law and includes the following:

Appellee is entitled to an adjudication determining the rights of the parties in and to the oil, gas, and other minerals produced from the real estate involved in this case by virtue of the terms of the oil and gas lease recorded in Book 1, page 341, of the Oil and Gas Records of Kimball County.

Appellee is the owner of an undivided 1/4 interest in and to the oil, gas, and other minerals in and under Tract 1 and a 4/4 interest in the oil, gas, and other minerals in and under Tract 2 subject to the oil and gas lease. Dean Terrill is the owner of an undivided 1/4 interest and Gem Oil Company and its assigns are the owners of an undivided 1/2 interest in and to the oil, gas, and other minerals in and under Tract 1 subject to the oil and gas lease.

Appellee is the owner of and is entitled to have and receive 200/320, Dean Terrill is the owner of and is entitled to receive 40/320, and Gem Oil Company and its assigns are the owners of and they are entitled to receive 80/320 of the royalty share of the oil, gas, and other minerals produced, saved, and marketed from the real estate involved herein under the terms and provisions of the oil and gas lease.

Appellee is entitled to have an accounting made by Gem Oil Company and the appellant mineral owners as to the time and amounts by which the 3/5 of the royalty becoming due by virtue of production of oil from Tract 1 until April 5, 1955, were paid and received erroneously

and appellee is entitled to have and receive said amounts so erroneously paid and received with interest thereon at 6 percent per annum from the respective dates of said payments from the persons receiving the same. In the event appellee and the various appellants are unable to agree upon the accounting required to be made, appellee may make application to the district court for further relief.

The judgment and denial of motions for a new trial constitute the occasion of this appeal.

Appellants assert that appellee is estopped to have the royalty accruing by the production of oil from the leased real estate apportioned and paid in the method and manner provided by the terms of the lease. The answer of appellants alleges as a basis of this that appellee and his wife executed a division order dated June 15, 1954, by which they certified and guaranteed that they were the owners of $\frac{1}{4}$ of $\frac{1}{8}$ royalty interest in the oil produced from Tract 1; that they authorized Gem Oil Company to pay the royalty as is provided in the division order; that payments from such production were made to, received, and accepted by appellee as the division order provided for all production through April 5, 1955; and that appellee is estopped to deny that his royalty ownership is other than as certified by him in the division order or from claiming any other or additional rights to royalty from such production. The disclosure of the record concerning the division order and what was done because of it have been herein detailed.

Appellants argue that the law is that the execution of a division order setting out the interests of all claimants to the oil and the acceptance of benefits thereunder estops a signer thereof from claiming a greater interest as against the other parties thereto unless and until the order is modified or withdrawn. Appellants do not claim that the division order contains words of grant or conveyance. Contrary thereto they expressly disclaim any contention that it is equivalent to a transfer, assign-

ment, or conveyance of the interest held by the parties executing it. However, appellants strenuously urge the conclusion that the execution of the division order and the acceptance of royalty benefits thereunder by appellee bar him from having or claiming a greater interest in the royalty for production of oil prior to April 5, 1955, than that specified in the division order.

The exhibit in the record referred to as a division order is a composite copy of a division order addressed to Gem Oil Company compiled from counterparts each with some of the signatures referred to and each person whose name is typewritten below a signature line on the exhibit actually signed a counterpart of the exhibit. This practice and what results from it is discussed in Sullivan, Handbook on Oil and Gas Law, page 140, in this language: "It is a misnomer to speak of it as an instrument because it is not unusual to have a number of division orders executed—one by each of the parties who has an interest in production, viz., the lessee, the lessor, and owners of fractional interests carved out of either the working or the royalty interest. Consequently, even though it may constitute a contract between the sellers on the one hand and the purchasers on the other, it is not necessarily a contract between the sellers themselves."

Hershey v. Hershey, 3 Ill. App. 2d 307, 122 N. E. 2d 69, is in several important respects quite similar to the present case. The individual parties to that action executed a division order which incorrectly stated their respective interests in the oil royalties on a tract of land. The error was not discovered by Albert Hershey, one of the royalty owners and the plaintiff in the action, for about 6 years after the execution of the division order. He then advised the pipe line purchaser of the oil, Ashland Oil and Refining Company, one of the defendants, and all further royalty payments were withheld. The royalty owners who were overpaid refused to voluntarily return to plaintiff the amount of the over-

payment previously made. The trial court granted the complaint of plaintiff for an accounting and decreed that appellants return the amount of the overpayment. The syllabus in that case states: "Where the signers of a division order are cotenants of the oil there seems to be no basis for saying they are contracting with each other, and by signing a division order it would seem that a person admits the amount of oil set apart to him therein but expresses no intention to convey or transfer any portion thereof to any other person."

The opinion contains this: "It is the contention of appellants in this court, in brief, that since all the parties signed the division order, while plaintiff is entitled to secure his proper interest in oil production after the error was discovered and notice given, that he could not require repayments from the codefendants for royalty oil which was taken and paid for under the terms of the division order. The theory of appellants is that the division order constituted a binding agreement among the co-owners. * * * The decree of the trial court was entered in support of plaintiff's theory. We believe that such decree was proper and should be affirmed, principally, because the co-owners can hardly be considered in a status of being innocent purchasers for value. * * * As stated by Professor Summers in his work on Oil and Gas (Vol. 3, at page 423), where the signers of a division order are cotenants of the oil, 'there seems to be no basis for saying they are contracting with each other.' The author goes on to state that by signing a division order it would seem that a person admits the amount of oil set apart to him therein, but expresses no intention to convey or transfer any portion thereof to any other person. It is apparent to us that it would be improper to permit the cotenants to profit by a mistake made by the Oil Company in preparation of a division order, or by the plaintiff's failure to discover the mistake before signing the order. It is true that plaintiff would be estopped from asserting a claim as against

the Oil Company, but he certainly was not estopped from asserting his rights as against his cotenants, who were not entitled to the royalties which were being paid to them. Plaintiff was entitled to an accounting from them. Barring plaintiff from recovering as against the cotenants would be grossly unfair, and not justified by any precedents in this State."

The circumstances considered in Dale v. Case, 217 Miss. 298, 64 So. 2d 344, 37 A. L. R. 2d 811, were that Case executed a mineral deed of an undivided interest to Dale subject to the limitation that "This deed shall not participate in present oil and gas lease, * * *." Dale conveyed his interest to three other persons subject to the quoted limitation. Production of oil was obtained under the original lease by Stanolind Oil & Gas Company, assignee of the lease. It circulated division orders stating the name of Dale and his fractional interest. Case, Dale, and others signed the division orders and Dale collected royalties for about 2 years when Case brought suit asking that the purchasing company be required to reimburse him for the royalty paid to Dale and the grantees of Dale. The latter by cross-bill asked that the deed be reformed so as to provide that rentals only and not royalties were reserved by Case by the limitation in the mineral deed he gave Dale. The court discussed the matter in this way: "Finally, the appellants' attorneys contend that, when Case and his wife signed the division orders, and failed to register a protest on account of the failure of the division orders to show Case's ownership of the royalty rights under the lease in the mineral interest conveyed to Dale, they thereby assented to Dale's interpretation of the reservation clause in the mineral deed. But, as we have already stated, in our opinion the meaning of the reservation in the mineral deed which Dale accepted is clear, and Dale was not entitled to the royalty payments to be made under the existing lease. Dale acquired no greater rights as a result of Case's signing of the division orders. Dale

was not entitled to profit by the mistakes made by the operating companies in the preparation of the division orders or by Case's failure to discover the mistakes before signing the orders.  * * * Case, after signing the division orders, was estopped from asserting a claim against the oil companies for the amounts paid to Dale prior to the filing of the bill of complaint, but Case was not estopped from asserting his rights against Dale and his grantees who were not entitled to the royalties which were being paid to them."

The court, in Stanolind Oil & Gas Co. v. Terrell (Tex. Civ. App.), 183 S. W. 2d 743, considered an oil and gas lease which provided that the lessor should receive a $64,000 oil payment without any deduction of any kind for any purpose. A division order executed later by the lessor provided with unclouded clarity that the purchaser of the oil should deduct from the payment the gross production tax imposed by the state on the lessor's share of the oil. The purchaser of the oil deducted the tax from the payment due lessor by the terms of the lease. The lessor sued for the amount deducted. The purchaser contended that the terms of the oil payment provisions of the lease were modified by subsequent contract of the parties, that is, the division order addressed to the appellant and signed by the lessor. The judgment for plaintiff was affirmed. The court therein said: "A 'division order' is ordinarily the contract under which production of oil or gas is purchased or accepted for transportation by pipe line company. * * * Where lessor, who was entitled under oil lease to one-eighth of proceeds of oil produced without deduction for production tax, executed division order to lessee relating only to sale of oil production lessor owned by virtue of terms of lease, lessor did not change her rights under lease requiring production tax to be paid by lessee notwithstanding she consented in such order that lessee in its capacity as first buyer should deduct such tax from purchase price." The opinion

states: "A division order is ordinarily a contract under which the production is purchased or accepted for transportation by the pipe line company. * * * The division order signed by the lessors * * * and the subsequent like division order signed after Roy Terrell's death, had for its predominant purpose the sale of the production to appellant. We find no basis whatever for holding that it evidenced, or provided for, any change in the purchase price or consideration which the lessee was obligated to pay the lessors by the terms of the lease. It recites that appellant is the owner of the $7/8$ working-interest, subject to the $64,000 oil-payment, $2/3$ to Terrell and $1/3$ to Hulen. It further recites that Terrell owns $2/3$ of the $1/8$ royalty interest, and Hulen $1/3$ of the $1/8$ royalty interest. There is nothing contractual in these recitations, they merely reflect the interest of the parties as created by the lease. The provision of the division order, so strongly relied on by appellant, relates only to the sale of the production which the lessors owned in virtue of the terms of the lease. We here repeat such provision: 'Settlements and payments shall be made monthly for oil received and purchased during the preceding month * * * to the respective parties, respectively, less any taxes required by law to be deducted and paid by you (Stanolind) as purchaser.' It is not intended by such provision in the division order to affect appellant's obligation as lessee." See, also, Tilley v. Allied Materials Corp., 208 Okl. 433, 256 P. 2d 1110; Snider v. Snider, 208 Okl. 231, 255 P. 2d 273.

Sullivan, Handbook of Oil and Gas Law, p. 142, states this conclusion: "A division order does not supersede the lease by operating as a novation as to the royalty."

In 3 Summers, Oil and Gas (Perm. Ed.), § 590, pp. 423 and 424, respectively, the comment is made: "But ordinarily where the signers of a division order are strangers and at most cotenants of the oil, there seems no basis for saying that they are contracting with each other," and "By signing a division order it would seem

that a person admits that he owns the amount of oil set apart to him therein, but expresses no intention to convey or transfer the remainder to signers or to the purchasing company."

In 1 Oil and Gas Reporter, p. 1175, the following is stated: "Acquiescing in royalty payments to the wrong party is not enough to create an estoppel against the real owner of royalties. The usual requirement of a change of position by the one asserting estoppel which would render it inequitable for the real owner to assert title is applicable."

The doctrine in this jurisdiction is that to create an estoppel by the acceptance of benefits it is essential that the party against whom the estoppel is claimed should have acted with knowledge of his rights; that the party claiming the estoppel was without knowledge or means of knowledge of the facts on which he bases his claim of estoppel; that he was influenced by and relied on the conduct of the person sought to be estopped; and that he changed his position in reliance thereon to his injury. This doctrine is for innocent people and only they may invoke it. Sedlak v. Duda, 144 Neb. 567, 13 N. W. 2d 892, 154 A. L. R. 490; In re Estate of Lee, 137 Neb. 567, 290 N. W. 437; Shelby v. Platte Valley Public Power & Irr. Dist., 134 Neb. 354, 278 N. W. 568; Rea v. Pierson, 114 Neb. 173, 206 N. W. 760.

The information in the record concerning appellee is meager. It consists substantially of the fact that he owned two tracts of land of 160 acres each in Kimball County subject to an indebtedness of considerable amount, payment of which was secured by a mortgage on the land. His principal concern was to get the debt paid and the mortgage discharged. The intensity of his desire relative to this is indicated by the sale of $\frac{1}{2}$ of the minerals in and from Tract 1 a very short time before the discovery of oil and the sale of $\frac{1}{4}$ of the minerals in and from the land on the day an oil well was brought in. It is a fair inference that appellee knew

he was, by virtue of the oil and gas lease he executed, entitled to $\frac{1}{8}$ of any oil produced from the land; that he conveyed $\frac{3}{4}$ of the oil in and under Tract 1; and that he had retained $\frac{1}{4}$ of the oil, gas, and other minerals in and under the land. There is no evidence that appellee had the slightest knowledge or even a suspicion that he owned any greater interest in the oil, gas, or other minerals. The conviction is not difficult that appellee had no information or knowledge of the actual quantity of his ownership in the oil produced. It required a very considerable knowledge of and proficiency in mathematics and more than slight technical training to determine this from the mineral deeds and the long and involved provisions of the base lease. The authors of the division order were experienced in the oil-producing business. They misstated the true interest of appellee in the royalty. They either did not know what it was or if they did know they intended to deal unjustly with appellee. The fractional interests set forth in the division order could well have confused and frustrated appellee. The statement of the court in Dale v. Case, *supra,* concerning the difficulty in a similar situation is appropriate: "The fractions appearing on the reverse side of the division orders which Case signed might have puzzled the mind of a bank president * * * who was accustomed to dealing in figures of that kind * * *." The record is barren of anyone in any of the numerous contacts made with appellee on behalf of Gem Oil Company, Fisher, Terrill, and Magnolia Petroleum Company stating, suggesting, or even hinting to appellee that he owned or might be entitled to a greater proportion of the oil production from the land. The conclusion is justified that the first time appellee had the faintest idea that he might be entitled to a larger or additional interest was when he was solicited to execute the instrument prepared by Magnolia Petroleum Company dated January 26, 1955. His response was that he would not act in reference to it until he

consulted his lawyer. He did not sign the instrument. He soon thereafter commenced this litigation. Prior to that time it cannot be found that appellee acted in reference to any of the matters concerned in this case with knowledge of his actual interest in the oil produced.

Appellants have not made it certain by what acts they claim appellee asserted rights inconsistent with those subsequently claimed by him. The argument seems to be that because appellee signed the two writings called STIPULATION OF INTEREST AND AGREEMENT, neither of which was completed as to execution because Magnolia Petroleum Company refused to sign either and both were so completely abandoned that the original of neither could be produced at the trial notwithstanding they were in the custody and files of Gem Oil Company when they were last seen; because appellee signed the division orders, one directed to Gem Oil Company and the other addressed to Stanolind Oil Purchasing Company; and because appellee accepted remittances sent him by Gem Oil Company for less than he was entitled to receive, he is making claims inconsistent with what he previously asserted. It is proper to say that appellee acquiesced in what the appellants, especially Eddie Fisher, Gem Oil Company, and Dean Terrill, undertook to set up. Appellee unwittingly signed papers which were intended by their authors to deprive appellee of more than one-half of what his legal interest was but appellee was not thereby proposing anything or asserting any rights or claims. He was riding along on what had the appearance of being matters of red tape to meet the requirements of Magnolia Petroleum Company. The agreements of interest did not become effective for any purpose. Dean Terrill, experienced oil man and Chicago attorney, properly appraised the situation and expressed the requirements to make them effective but this was never accomplished. He, in his letter of July 1, 1954, to Gem Oil Company, with a copy thereof to Eddie Fisher, suggested that "* * *

inasmuch as the lease provision that occasions the difficulty is one inserted for the benefit of the lessee, that Magnolia * * * and Eddie (Fisher), as lessee of the 160 acre tract, concur in the instrument." Dean Terrill, Eddie Fisher, Gem Oil Company, and others were seeking to accomplish their desire in some manner which would prevent appellee from knowing what it was all about. Dean Terrill characterized what they wanted when he wrote as part of the same letter: "Of course, anything favorable indicative of the true interest of the parties would be helpful in the event of a contest." That is, anything that Magnolia Petroleum Company would accept and that would not alert appellee that he was thereby being deprived of more than half of what he owned would be helpful to appellants. The record fails to show that appellee asserted particular rights inconsistent with those subsequently claimed.

The record denies that appellants were without knowledge or means of knowledge of the facts; that is, that they did not know or did not have the means of informing themselves as to the quantity of interest of appellee. The base lease and the mineral deeds contained the information; the lease was of record more than 4 years before the mineral deeds were made; and the deeds, by the provisions in each of them, were made subject to the lease. The farmout proposal to Eddie Fisher was expressly made subject to the base lease. Fisher examined the records as to appellee's ownership of the royalty but he "completely overlooked the entirety clause which was of record in the lease to Magnolia." Appellants were charged with knowledge of the quantity of the ownership by appellee of the oil produced. The record fails to show that appellants relied upon anything appellee did or omitted or that appellants changed their position in reliance thereon to their prejudice or injury. The record fails to show any of the indispensable requirements for an estoppel of appellee to exist in this case.

Appellants strenuously insist that the writings of July —, 1954, and September 1, 1954, each entitled STIPULATION OF INTEREST AND AGREEMENT effectively amended the base lease and removed the entirety clause therefrom as to Tract 1 because they were signed by Eddie Fisher, Gem Oil Company and its leasehold assigns, and appellee. This is tantamount to saying that assignment of a portion of the lease worked a division of the entirety clause so that each unit was thereafter to be treated as though leased separately in the first instance. The thesis of appellants in this respect may not appropriately be pursued until it is determined whether or not either of the writings on which it is based became effective for any purpose.

The idea of securing a writing destroying the effectiveness of the entirety clause as to Tract 1 apparently originated with Gem Oil Company in late June as expressed in a letter to Dean Terrill. He was an experienced oil man, practicing lawyer in Chicago, and had a royalty deed for $\frac{1}{4}$ of the minerals in and under Tract 1. He replied to the letter of Gem Oil Company on July 1, 1954, with a copy of the letter to Eddie Fisher, in this manner: "I take it from your letter of June 30 that it is contemplated the Hafemans will execute an instrument that will clearly provide for the division of the royalty production (or the cash proceeds thereto) from the 160 acre tract upon which the wells are located in the proportions of one-half to Eddie Fisher, one-fourth to them and one-fourth to me. May I suggest, inasmuch as the lease provision that occasions the difficulty is one inserted for the benefit of the lessee, that Magnolia * * * and Eddie, as lessee of the 160 acre tract concur in the instrument." The writing of July —, 1954, was prepared by Eddie Fisher, vice president of Gem Oil Company, dictated to its office manager, and written by her. It, by its form and contents, was intended to be executed by and be the contract of appellee and his wife, Gem Oil Company, Dean Terrill, and Mag-

nolia Petroleum Company. It contained the language following the "Whereas" clauses: "NOW, THEREFORE, the undersigned parties hereto have agreed as follows:" It was signed by appellee, his wife, Gem Oil Company, and Dean Terrill. It was sent by Gem Oil Company to the Magnolia Petroleum Company. It refused to sign and the writing was returned to Gem Oil Company. The second writing, dated September 1, 1954, was prepared by Gem Oil Company. It was identical with the first one except it contained two additional "Whereas" clauses. One concerned the assignment of the base lease as to Tract 1 to Eddie Fisher and the other related to the assignments of different interests in the lease by him to various parties. It was signed by appellee, his wife, Gem Oil Company, and Dean Terrill. Afterwards there was an addenda attached to the writing and it was signed by the owners of the working interests. The writing was sent by Gem Oil Company to Magnolia Petroleum Company. It refused to sign it and returned it to the sender with the comment that it "* * * would have the practical effect of leaving this royalty in a confused state, particularly so if production is obtained on the SE¼ of Section 12." The Magnolia Petroleum Company refused to sign either of the writings. The last thing known of them was that they were in the office of Gem Oil Company. They were so completely discarded by appellants that the original of neither of them could be found when search was made for them. It is a justifiable inference that as each was objected to by Magnolia Petroleum Company, a new writing was prepared and the preceding one was discarded and destroyed. This is indicated by a letter from Eddie Fisher to Dean Terrill in which he said: "Later on when this situation became apparent and ever since that time we have been trying to secure a waiver in such a form that would be signed by both Magnolia and Hafeman." The instrument dated January 26, 1955, prepared by the Magnolia Petroleum Company, was not signed by appellee.

When it was proposed to him he refused to take any action until he consulted with his lawyer. It was soon thereafter that this action was commenced. After the advent of this litigation a letter was written by Eddie Fisher to Dean Terrill which contains convincing proof that the intention was that none of the writings should be complete or effective until all the parties had signed and this was especially true as to appellee and the Magnolia Petroleum Company. The letter was concerning the dilemma of the appellants in this lawsuit. The statement is: "The whole thing is that we have no copies of a stipulation signed by both Hafeman and Magnolia * * *." The conclusion is inescapable that the writings were drawn and intended as mutual agreements by and between the parties named therein and were to be effective only when signed by each of them.

It is argued by appellants that the assignment provisions in the lease with express assumption of lease obligations in the assignment have the effect of discharging the rights and duties of the original lessee as to the entirety clause covenant insofar as it pertains to the assigned tract and to transfer all rights and duties inherent in that covenant to the partial assignee as to the assigned tract. The effect of the lease provisions concerned is to make the covenant to pay rent and royalties divisible upon assignment of a portion of the premises by the lessee. The incidence that one covenant is specifically made divisible by the terms of the lease does not require a conclusion that all other covenants of the lease are likewise divisible. A venerable rule of construction dictates an opposite conclusion. The doctrine of expressio unius est exclusio alterius applies. Ledwith v. Bankers Life Ins. Co., 156 Neb. 107, 54 N. W. 2d 409; Calvary Baptist Church v. Coonrad, *ante* p. 25, 77 N. W. 2d 821; Southern Coast Corp. v. Sinclair Refining Co., 181 F. 2d 960; Bischoff v. Francesa, 133 W. Va. 474, 56 S. E. 2d 865. If the parties had intended the entirety clause to be divisible, they could easily and should have so provided

by appropriate language in the lease. They did not but they did say that the covenant to pay rent and royalties is divisible. The correct interpretation of the lease under the rule referred to above is that the entirety clause was not intended to be and is not divisible.

The liability to pay royalties and the method of allocating royalties are not identical. By assignment of a portion of the leasehold the liability for payment of royalties accruing because of production from the assigned tract passes by virtue of the terms of the lease from the original lessee to his assignee. The relevant part of the lease is: "In the event of an assignment of this lease as to a segregated portion of said land, the rentals payable hereunder shall be apportioned as between the several leasehold owners ratably according to the surface area of each * * *. An assignment of this lease, in whole or in part, shall, to the extent of such assignment, relieve and discharge lessee of any obligations hereunder * * *." It is impossible to understand how these provisions can be authority for the splitting of the entirety clause upon assignment of a part of the leasehold with the result that the divided clause shall then attach to the parcels of the leasehold pro tanto. The obligation to pay royalties of necessity includes the duty to pay them as required by the entirety clause. This duty is extended, not divided, by an assignment of a portion of the leasehold. The remark of the court in Wilson v. Texas Company, 147 Kan. 449, 76 P. 2d 779, is pertinent: "The lease contract did provide for assignment, but it also expressly provided that its covenants were extended (not enlarged or decreased) to the assigns of the parties." If the appellants are correct in this regard, the reason for the existence of the entirety clause, the elimination of hardships prevalent under the nonapportionment rule, is defeated and the lessor is deprived thereunder without notice or recourse by the unilateral act of the lessee in making an assignment of part of the lease-

hold. The proper interpretation of the assignment provisions of the lease is that they provide for a division of liability for payment of rent and royalties but they also provide for an extension or continuation of the method of allocating royalties. Language in the first sentence of the assignment provision of the lease is convincing that the parties intended the extension rather than the divisibility of the entirety clause. The language is: "The rights of either party hereunder may be assigned in whole or in part and the provisions hereof shall extend to the * * * assigns * * *."

It is asserted in the pleadings of appellants that the parties to the mineral deeds mutually intended and agreed that royalty interests were being conveyed only as to the lands described in the deeds notwithstanding any provision of the oil and gas lease or the deeds to the contrary and that if the deeds were subject to the pro rata royalty provision in the lease, it was the result of a mutual mistake of fact of the parties to the deeds and reformation of the deeds should be granted to carry out the agreements of the parties which were inadvertently disfigured by a mistake in the deeds. The trial court after the reception of evidence offered by appellants, on motion of appellee, required appellants to elect between relying on the mineral deeds as made or relying on their request for reformation of the deeds. Appellants chose to rely on the deeds as made. The ruling of the court is challenged by appellants and they appeal to this court to give effect to the intention of the parties, grant the royalty owners the relief they demand based upon nonapportionment of the royalties, and reform the mineral deeds. They speak of reformation of the mineral deeds but what would be required to rescue them from the situation would be the elimination of the entirety clause in the oil and gas lease. Harley v. Magnolia Petroleum Co., 378 Ill. 19, 37 N. E. 2d 760, 137 A. L. R. 900. The lease was made and recorded in 1949. The transaction did not concern any of the appel-

lants but the record of the lease was notice of its contents to anyone dealing in any way with the land described in it. The lease contains this provision: "If the leased premises shall hereafter be owned in severalty or in separate tracts, the premises, nevertheless, shall be developed and operated as one lease, and all royalties accruing hereunder shall be treated as an entirety and shall be divided among and paid to such separate owners in the proportion that the acreage owned by each such separate owner bears to the entire leased acreage." Each of the mineral deeds was by provision therein made subject to the lease. There is no claim of ambiguity in the deeds or fraud in the transaction resulting in their existence. The basis claimed for reformation is mutual mistake. The record is without proof of any mistake, much less mutual mistake, inducing the execution and acceptance of the deeds. It is not even claimed that either of the deeds does not truthfully and precisely express exactly what the true transaction was that eventuated in it. There was delivery and acceptance of delivery of the deeds as effective conveyances. It has long been the law of this state that if persons to a transaction put their engagement in writing in such terms as to import a legal obligation without uncertainty of object or extent of the engagement, it is conclusively presumed that the entire engagement of the parties and the extent and manner of their undertaking have been reduced to writing. In Barkalow Bros. Co. v. English, 159 Neb. 407, 67 N. W. 2d 336, this court said: "In the absence of fraud, mistake, or ambiguity a written agreement is not only the best evidence but the only competent evidence as to what is the contract of the parties." It is stated in Frentzel v. Siebrandt, 161 Neb. 505, 73 N. W. 2d 652, that: "A preponderance of evidence sufficient to justify reformation of a written instrument requires proof that is clear, convincing, and satisfactory. * * * The law presumes that a person who makes a contract understands its meaning and effect and that he has the

intention which its terms manifest. * * * A written contract expressed by clear and unambiguous language is not subject to interpretation or construction. * * * The intention of the parties to a written contract expressed by clear and unambiguous language must be determined from its contents." See, also, Hansen v. Bruce, 162 Neb. 759, 77 N. W. 2d 458. Instruments and conveyances of minerals and mineral rights are subject to these principles of law. Meeks v. Harmon, 207 Okl. 459, 250 P. 2d 203; McNeill v. Shaw, —— Okl. ——, 295 P. 2d 276; Remuda Oil Co. v. Wilson (Tex. Civ. App.), 264 S. W. 2d 192; Hoffman v. Sohio Petroleum Co., 179 Kan. 84, 292 P. 2d 1107; 24 Am. Jur., Gas and Oil, § 22, p. 533.

The remedy of reformation has no application to this case. The lease and the mineral deeds must be accepted and enforced, to the extent they are important to this case, as they are written. The entirety clause of the base lease is set out above.

The Supreme Court of Kansas within the present year decided an entirety clause case, Hoffman v. Sohio Petroleum Co., *supra,* which involved the circumstances that appellees acquired by deed the northwest quarter and appellants acquired by deed the northeast quarter of the same section of land after both tracts had been leased together by an instrument containing the entirety clause. Each of the deeds recited it was made subject to the oil and gas lease on the land. Oil was produced from the northwest quarter but no oil was produced from the northeast quarter. The owners of the latter claimed one-half of the oil royalty by virtue of the entirety clause. The owners of the northwest quarter claimed they were the owners of such production because it was produced from their land. The court sustained the claim of the owners of the northeast quarter because of the entirety clause which the court said was a valid, enforceable contract provision. The decision contains this: "In the face of the record the incon-

trovertible facts are that appellees, and * * * the appellants, acquired the respective tracts of real estate * * * (by) deeds specifically reciting that each tract of real estate was being sold and conveyed subject to the terms and provisions of such oil and gas lease. That * * * meant that when they accepted their respective deeds they made them contracts in writing whereby they not only took, but agreed to take, their particular tracts with whatever benefits or burdens might eventually come to them under the terms of such lease. Included in the benefits and burdens of that instrument were those imposed by the terms of the entirety clause * * *. Having agreed to accept its terms and conditions neither appellees nor appellants can now be heard to dispute or deny that during its existence royalties accruing from the entire acreage of the land covered by the terms of the basic oil and gas lease shall be paid to them as separate owners in the proportion that the acreage now owned by them bears to the entire leased area."

Rauner v. Jones, 159 Neb. 385, 67 N. W. 2d 347, determined: "In the absence of an express agreement or controlling valid governmental regulations the owner of the mineral interests under a portion of land subject to an oil and gas lease is entitled to all of the rents and royalties accruing from the production of oil or gas from that land even though the lease may cover other tracts. * * * By the terms of an entirety clause, such as is here contained in the gas and oil lease, the parties thereto agree that in the event the mineral interests under the leased premises become separately owned that the royalties shall nevertheless be treated as an entirety, the separate owners to participate pro rata. * * * This voluntary provision in a lease has the effect of placing a restriction upon the power of the lessor to alienate his mineral interests therein contrary thereto as long as the lease containing this clause remains in force and effect."

The extended discussion of appellants directed to their

contention that this court should interpret or restate the decision made in the Rauner case or at least modify or restrict its application has been examined and considered. The conclusion from this study is that the Rauner case is unambiguous, sound, and desirable; that this case contains nothing that justifies any less than the affirmance of what is said in the Rauner case; and that the impact of it to the extent it is applicable to this case is decisive of it.

Appellee by cross-appeal insists that Gem Oil Company and Dean Terrill are liable for the amount of royalty wrongfully withheld from appellee on account of the oil production from Tract 1 through April 5, 1955. The appellants insist that the cross-appeal is moot and should be denied.

The district court found that Arthur H. Hafeman was entitled to recover from the defendants owning royalty interests in Tract 1 during the period between the time of first production therefrom to April 5, 1955, the sum of $19,081.70. The judgment debtors are identified as the persons named in paragraph 7 of the petition in the case in the district court. Supersedeas bonds were filed and approved by the persons against whom the judgment was rendered in the sum of $20,500 conditioned as the statute requires. All royalties have been retained by the purchaser of Tract 1 since April 5, 1955.

The argument is that if the judgment is affirmed, it will be paid to the judgment creditor because it is secured and guaranteed by supersedeas bonds. Consequently any additional adjudication of liability to the judgment creditor would be of no advantage to him and because of this the cross-appeal is moot. There is no effort made by any party to establish when a cause, in a legal sense, is moot.

In the decision of State v. First Catholic Church of Lincoln, 88 Neb. 2, 128 N. W. 657, there is the following: "In Adams v. Union R. Co., 21 R. I. 134, 44 L. R. A. 273, it is said: 'A moot case is one which seeks to

determine an abstract question, which does not rest upon existing facts or rights. Where a concrete case of fact or right is shown, we know of no principle or policy of law which will deprive a party of a determination simply because his motive in the assertion of such right is to secure such determination. It is a matter of common practice.' "

In State ex rel. Kennedy v. Broatch, 68 Neb. 687, 94 N. W. 1016, 110 Am. S. R. 477, this court declared: "Abstract questions of law can not be made the subject of litigation. There must be real parties and a res in dispute that will become res judicata when the litigation is determined." See, also, Lincoln National Bank & Trust Co. v. Grainger, 129 Neb. 451, 262 N. W. 11; McCarter v. Lavery, 101 Neb. 748, 164 N. W. 1054; In re Application of Gering & Co., 88 Neb. 192, 129 N. W. 430; State v. Savage, on rehearing, 64 Neb. 702, 91 N. W. 557; Black's Law Dictionary (De Luxe Ed.), Moot, p. 1159.

It is evident that the demands of the parties in the matters presented are adverse. They rest upon existing facts and rights and affect the subject matter of litigation. The fact that the judgment creditor has recovered one judgment and its payment has been assured by bonds, if judgment is sustained, is not the whole answer. Several actions may be brought and as many judgments recovered against various wrongdoers although but one satisfaction may be had. Fitzgerald v. Union Stock Yards Co., 89 Neb. 393, 131 N. W. 612, 33 L. R. A. N. S. 983; Luikart v. Mains, 130 Neb. 907, 267 N. W. 168. The matter presented by the cross-appeal is not moot.

The cross-appeal is based on the hypothesis that a trust relationship existed between Gem Oil Company and Dean Terrill, hereafter called appellants, on the one hand, and Arthur H. Hafeman, appellee, on the other and that because thereof appellee is entitled to judgment against the appellants for the whole of the amount

of the royalty owned by appellee which was distributed and paid to others as found and determined by the district court.

Gem Oil Company was the lease owner, lease operator, and mineral-interest owner. All appellant mineral owners secured their interests from Gem Oil Company. Its acts involved in this case were invariably conceived and directed by Eddie Fisher and generally he was the person who performed them for it as its most active officer and representative. When Gem Oil Company was made grantee in the mineral deed, supplanting Eddie Fisher therein, on April 22, 1954, it and appellee became cotenants and by the agreement of May 14, 1954, and the execution and delivery of the mineral deed pursuant to it on the next day Dean Terrill, grantee therein, became a cotenant of the minerals in and under Tract 1 with Gem Oil Company and appellee. Prairie Oil & Gas Co. v. Allen, 2 F. 2d 566, 40 A. L. R. 1389; Earp v. Mid-Continent Petroleum Corp., 167 Okl. 86, 27 P. 2d 855, 91 A. L. R. 188; Callahan v. Martin, 3 Cal. 2d 110, 43 P. 2d 788, 101 A. L. R. 871; New Domain Oil & Gas Co. v. McKinney, 188 Ky. 183, 221 S. W. 245; 3 Summers, Oil and Gas, § 609.1, p. 297, 1956 Cum. Pocket Parts.

Eddie Fisher on June 22, 1954, transferred leasehold interest to appellants. These transfers gave appellants possession, control, and operation of the leasehold and mineral estates. This resulted in the common property of the cotenancy, the minerals and the proceeds therefrom, and the distribution of the proceeds of the royalty oil being controlled by two of the cotenants to the exclusion of the third, the appellee. The fact of cotenancy alone did not create a fiduciary relationship as to the estate owned by the cotenants. Sharples Corp. v. Sinclair Wyoming Oil Co., 62 Wyo. 341, 167 P. 2d 29; Bunger v. Rogers, 188 Okl. 620, 112 P. 2d 361. However, there were additional facts. Two of the cotenants, by virtue of their multiple ownerships, acquired the possession, op-

eration, and control of the property of the cotenancy to the exclusion of appellee who was the third cotenant. It was while this condition existed, and probably because of it, that the proceeds of the royalty oil were improperly distributed by Gem Oil Company to the prejudice and injury of appellee. A cotenant having control of the common property has been said to be a trustee for his cotenant to the extent of the interest of the cotenant and he may have and compel an accounting. In Rice v. Peters, 128 App. Div. 776, 113 N. Y. S. 40, it was held: "A tenant in common receiving the common property, either wrongfully or by consent, holds it as trustee for his co-tenant to the extent of the interest of the co-tenant, who may compel an accounting."

In Twyford v. Sonken-Galamba Corp., 177 Okl. 486, 60 P. 2d 1050, it is said: "We have here a situation where parties have knowingly dealt with trust property. A tenant in common in possession holds the common property in trust for his cotenant."

Appellants deny this and say there were no fiduciary obligations involved in any of the matters concerned in this litigation but only an obligation of good faith, the performance of which should be discharged with ordinary care and diligence. The contention of appellants in this regard will be noticed further hereafter. However, with or without fiduciary obligations, it may not successfully be contended that a tenant in common of oil in place who develops and sells the oil must not truly account to a cotenant for the value of his share of the oil less, of course, the reasonable expense of producing it.

The court declared in Prairie Oil & Gas Co. v. Allen, *supra:* "Tenant in common of oil underlying land, which has been extracted by lessee of a cotenant, is entitled to an accounting from lessee for market value of oil produced, less reasonable and necessary expense of developing, extracting and marketing * * *." See, also, Earp v. Mid-Continent Petroleum Corp., *supra;* Silver

King Coalition Mines Co. v. Conkling Mining Co., 255 F. 740.

In Carter Oil Co. v. Crude Oil Co., 201 F. 2d 547, Grisso, the owner of two noncontiguous tracts of 80 acres and 40 acres, leased them for oil and gas by one lease which contained an entirety clause. Thereafter Grisso conveyed to Gast an undivided one-fourth interest in oil and gas in the 80-acre tract. Carter Oil Company procured the lease by assignment and produced oil on the 40-acre tract. Gast conveyed his interest to Crude Oil Company. It, by the entirety clause, was entitled to one-sixth of one-eighth royalty from the production on the 40-acre tract but for many years all of the royalties were paid by Carter Oil Company to Grisso. Crude Oil Company brought suit against Carter Oil Company for its share of the royalties. The court decided there was no fiduciary relationship between Carter Oil Company and Crude Oil Company but because the former paid the royalties to Grisso with knowledge that Crude Oil Company was entitled to a share thereof as cotenant of Grisso, it was charged as a matter of law with knowledge that Grisso became a trustee of such payments as to the Crude Oil Company; and since Carter Oil Company had sufficient information to put it on notice that Grisso was misappropriating the royalty payments made to him, Carter Oil Company was liable to Crude Oil Company for the royalty paid by it to Grisso. The opinion of the court in that case contains these statements: "It seems clear from the record that at the time of the assignment of the mineral interest to Gast neither he nor Grisso comprehended the legal effect of the entirety clause of the lease and that both labored under the erroneous impression that the assignment conveyed only a mineral interest in the 80 acre tract. * * * It is, however, obvious that thereafter Grisso learned that the entirety clause gave Gast an interest in the production from the 40 acres not included in the assignment to Gast. * * * While there is no

fiduciary relationship between tenants in common, if one co-tenant comes into possession of funds belonging to his co-tenant, he becomes trustee of such funds and stands in fiduciary relationship to his co-tenant with respect thereto."

Gem Oil Company and Terrill were not only in possession of the royalties accruing to the cotenants as was Grisso in the Carter Oil Company case but were also by virtue of being mineral owners and leaseowners in complete control of that from which the royalties flowed, that is, the mineral estate in which they were cotenants with Hafeman. All of the proceeds from the sale of the oil were paid to Gem Oil Company. It allocated and distributed the proceeds. When it paid out erroneous shares of the proceeds to itself, to Terrill, and others it was in the exact position of Carter Oil Company in the case above quoted and also in the position of Grisso. Gem Oil Company not only knowingly paid royalties in erroneous proportions as did Carter but it also knowingly received and held such erroneous payments for its benefit and enrichment just as Grisso did in the last case quoted. Terrill's position is identical with what Grisso's position was in the Carter Oil Company case, that is, knowingly receiving and holding misappropriated royalties and by virtue of his leasehold ownership he was charged with the correct payment of royalties and hence also stands in the position in which Carter Oil Company found itself. Appellants did not heed and observe the standard of conduct stated by Justice Cardozo in Meinhard v. Salmon, 249 N. Y. 458, 164 N. E. 545, 62 A. L. R. 1, frequently referred to and quoted: "A trustee is held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior. As to this there has developed a tradition that is unbending and inveterate. Uncompromising rigidity has been the attitude of courts of equity when petitioned to undermine the rule of undivided loyalty

by the 'disintegrating erosion' of particular exceptions * * *."

The public records were checked by Eddie Fisher in April 1954 as to the ownership of royalty by appellee. The base lease was a part of the records. It contained the information as to the part of the royalty oil appellee owned. Terrill contracted to purchase minerals in Tract 1 from appellee on May 14, 1954, and the deed to him is dated the next day. Eddie Fisher and Gem Oil Company were engaged in the oil-producing activity. Terrill was a Chicago lawyer and had practiced his profession for about 25 years. He had been in the oil business for approximately 18 years. Each of the instruments made after the lease was expressly made subject to the lease. Appellee was the owner of the equity of redemption of the land described in the lease. There is no indication that he had any previous experience concerning leasing land for exploration or production of oil or with the production of oil. There is no indication in the record that appellee could by himself have determined his true ownership in the oil royalty.

There is evidence that as early as June 1954 the Gem Oil Company communicated with Terrill concerning securing a writing from appellee barring him from claiming that he was the owner of more than $\frac{1}{4}$ of $\frac{1}{8}$ of the royalty oil. It is a permissible inference that it then, and probably much earlier, knew of the entirety clause in the lease and the true interest appellee owned in the royalty. Appellants knew of it then because Terrill referred to it in the letter he wrote July 1, 1954, "as the lease provision that occasions the difficulty is one inserted for the benefit of the lessee" and he counseled that an instrument should be secured from the Hafemans, Eddie Fisher, and Magnolia Petroleum Company clearly fixing the division of the royalty or the proceeds of it from Tract 1 in the proportions of $\frac{1}{2}$ to Eddie Fisher, $\frac{1}{4}$ to Hafeman, and $\frac{1}{4}$ to Terrill. He added that such an instrument would be "helpful in the event of a con-

test." They unsuccessfully continued their efforts in that respect until shortly before the inception of this litigation.

The record is convincing that appellants had actual knowledge of the true interest of appellee in the royalty before any of the proceeds of the royalty oil were allocated and paid by the Gem Oil Company. However, they had the means of knowledge and were charged with it before any of the royalty was distributed and paid. They boldly disregarded what they were bound to know and misappropriated more than half of what appellee owned of the royalty. Appellants were each enriched thereby and cannot be heard to say that they are not liable for the whole amount of the misappropriation. Appellants have failed by a wide margin of meeting the standard they claim, that is, "good faith, the performance of which should be discharged with ordinary care and diligence." The cross-appeal is well taken and should be sustained.

The problem in case No. 34023, Arthur H. Hafeman v. Gem Oil Company et al., is whether or not the owners of a leasehold estate under an oil and gas lease are liable to the lessor for royalties. The relief sought is a reversal of the conclusion of the district court that the lease owners had no liability for the erroneous payment of the royalties and a direction to that court to render a judgment in favor of Arthur H. Hafeman and against the lease owners for the amount of royalties improperly diverted from Hafeman and paid to others.

The oil and gas lease was made by Hafeman and his wife to Magnolia Petroleum Company and it assigned the lease as to Tract 1 to Eddie Fisher. He assigned the lease and all his rights because of it to various persons identified in the record as the ones named in exhibit 4 on different dates commencing with May 8, 1954, and continuing through June 22, 1954. Each of them received an undivided fractional part of the lease assigned by the lessee to Eddie Fisher.

The consideration for the lease was $10, the royalties therein provided, and the agreements of the lessee as therein stated. It leased the land for the purpose of exploring for and producing oil from it. The royalties required to be paid by lessee on oil were ⅛ of that produced from the land and saved at the well, delivered free of cost at the well or to the credit of the lessor in the pipe line to which the well may be connected. The lease authorized the rights of either party because of it to be assigned in whole or in part and it provided that "the provisions hereof shall extend to the * * * successors, and assigns * * *." An entirety clause was contained in the lease and it described two noncontiguous quarter sections of land.

A covenant to pay rent or royalty is not personal or collateral but runs with the land. Hogg v. Reynolds, 61 Neb. 758, 86 N. W. 479, 87 Am. S. R. 522; Fennell v. Guffey, 139 Pa. 341, 20 A. 1048; Mound Valley Vitrified Brick Co. v. Mound Valley Natural Oil & Gas Co., 258 F. 936; Annotations, 41 A. L. R. 1370, 79 A. L. R. 499, 102 A. L. R. 784; 3 Summers, Oil and Gas, § 553, p. 297; Thornton, Oil and Gas, § 336, p. 611; 2 American Law of Property, § 9.4, p. 341.

The circumstances of the case of Hogg v. Reynolds, *supra,* were that Hogg owned and leased a section of land to Frey and Kirkpatrick as individuals. The lessees made a division between them of the demised premises and Frey, to whom was assigned the west half of the section, made an assignment of his interest in and to the lease to Reynolds, the defendant in the case. Reynolds paid to plaintiff, the owner of the land, one-half of the entire rent as provided by the original lease as it came due. Kirkpatrick, who had exclusive possession of the east half of the section, failed to pay his share of the last installment of rent due to the owner of the land and he sued Reynolds for it on the basis that he had by the assignment succeeded to the rights and assumed the liability of Frey. The court therein said: "The doctrine

of the authorities undoubtedly is that where a lessee assigns his whole estate in all the demised premises, the assignee is liable to the lessor for the whole of the rent reserved in the lease. The covenant to pay rent runs with the land, and the assignee, being in privity of estate with the landlord, is directly liable to him for the installments accruing while that relation exists. * * * Whether a person claiming an interest in real property under a lessee is liable upon the covenant to pay rent, or upon other covenants running with the land, depends upon the existence of privity of estate between such person and the lessor. * * * Frey, by the arrangement between himself and Kirkpatrick, became possessed of the entire interest of both lessees in the west half of the section; and the assignment of this interest to the defendant established between him and the plaintiff a privity of estate as to a distinct part of the land. * * * Being possessed of the whole estate of both lessees in part of the land the defendant was liable to the plaintiff for a proportionate share of the rent."

The "proportionate share of the rent" for which Reynolds, the assignee of Frey, one of the original lessees, became liable was one-half of the rent as required by the original lease. Likewise in this case the assignees of Eddie Fisher, who was the assignee of Magnolia Petroleum Company, the original lessee, by its assignment of the lease as to Tract 1, became liable to Hafeman for the rent and royalties as to Tract 1 according to the terms of the original lease. The status of Fisher was like that of Frey after Kirkpatrick had assigned his interest in the west half of the section. The owners of the leasehold as to Tract 1 by undivided fractional interests are in this case legally in the same status as Reynolds was after the assignment to him by Frey in the case quoted above. The owners of the leasehold estate in Tract 1 being possessed of the entire leasehold estate in part of the land are liable to Hafeman, the lessor, for the rent and royalties as to Tract 1 as provided in the lease. The

liability of the person claiming interest in real property under a lease upon the covenant to pay rent or other covenants running with the land depends upon the existence of privity of estate between such person and the lessor. The assignment by the lessee of the whole of his interest under a lease divests him of his privity of estate with the lessor and transfers it to his assignee who thereafter holds in privity of estate with the lessor. In Mayer v. Dwiggins, 114 Neb. 184, 206 N. W. 744, 42 A. L. R. 1102, it is said: "A lessee, during his occupancy of the demised premises, holds both by privity of estate and of contract. Assignment of the lease by the lessee divests him of this privity of estate and transfers it to his assignee, who thereafter holds in privity of estate with the lessor." See, also, State ex rel. Johnson v. Commercial State Bank, 142 Neb. 752, 7 N. W. 2d 654; Annotation, 52 L. R. A. N. S. 980 and 984.

In Fennell v. Guffey, *supra*, the court declared: "The defendant contends, however, that, as assignee of the lessee, he is not liable; that the suit should have been brought against his assignor. But the covenant was in the nature of a covenant to pay rent, and runs with the land. It is settled law that covenants to pay rent or royalty run with the land, and that the assignee of the lease is liable for the payment of all rents or royalties which accrued while he held the assignment of the lease * * *."

In Burton v. Forest Oil Co., 204 Pa. 349, 54 A. 266, this subject is discussed in this manner: "The assignee of the lease is liable for the rental of the premises by reason of the privity of estate existing between him and the lessor. The same is true of any subsequent assignee of the lease. Here the defendant company denies its liability for the one half of the rental, because, as it claims, the undivided one half interest in the lease was assigned to the Chartiers Oil Company by the assignee of the lessees. We are not called upon to determine the right of the lessor to recover against the Chartiers Oil.

Company for any part or all of the gas rental due the plaintiff.  * * * The possession and beneficial enjoyment of the premises for gas purposes by the defendant company were as complete and exclusive as the lessees were entitled to under the terms of the lease.  The defendant enjoyed all the benefits conferred by the covenants of the lessor.  It took possession and operated the gas well under the assignment from the lessee's assignee, 'subject to all royalties, rents and covenants of the lessee therein contained, to be rendered, paid and performed on and after November 8, 1890.'  It therefore held and operated the well under the covenant in the lease to pay the entire gas rental which, by reason of the privity of contract, the lessor could have collected from the lessees."

The author says in Mills and Willingham, Law of Oil and Gas, § 146: "* * * the assignee of an undivided interest in the entire lease becomes a tenant in common and as such jointly and severally liable for the performance of the covenants.  He is, therefore, liable for all the delay rentals and for all the royalty, although he may in turn have a remedy against his joint obligor." See, also, Pierce Fordyce Oil Assn. v. Woodrum (Tex. Civ. App.), 188 S. W. 245; Edmonds v. Mounsey, 15 Ind. App. 399, 44 N. E. 196; Bradford Oil Co. v. Blair, 113 Pa. 83, 4 A. 218, 57 Am. R. 442; Heller v. Dailey, 28 Ind. App. 555, 63 N. E. 490; Jackson v. O'Hara, 183 Pa. 233, 38 A. 624; 2 Thornton, Oil and Gas, § 336, p. 611; 1 American Law of Property, § 3.61, p. 310.

The lease owners have not asserted that the payment of royalties to persons not entitled thereto would or should absolve them of liability to the rightful royalty owner.  It seems axiomatic that the duty to pay royalties implies the obligation to pay them correctly.  In 2 Thornton, Oil and Gas, § 375, p. 671, it is asserted:  "If a lessee fail or refuse to deliver the lessor his share of the oil reserved as royalty he will be liable for the actual market value of the oil at the date of refusal to deliver, with interest from that date."  The next section of that

work (§ 376, p. 671) says: "It is the duty, of course, of the lessee or his assignee, to deliver the royalty oil to the lessor or his grantee or assignee; and if he did not he will be liable for its value."

The owners of the leasehold as to Tract 1 by accepting assignments of the lease contracted to pay the lessor the rental and royalties. The lease authorized an assignment of it in which event the provisions thereof as to the payment of rent and royalties should extend to the assignees. The obligation to pay royalties to Hafeman, the lessor, to the extent of his ownership of them was a provision of the lease which the assignees became bound to satisfy. The case of Kimball v. Hardy, 124 Neb. 80, 245 N. W. 261, decided: "Where a lessee vacated certain leased premises and transferred his interest therein to a third party who procured tenants and collected the rentals and agreed to 'observe all the covenants in the lease of said premises to the said second party (the lessee) given by the owners thereof, and to save the second party harmless with reference thereto,' held, that such agreement constituted the third party an assignee of the lease and that he is liable for any unpaid rentals due the plaintiff lessor." The owners of the base lease as to Tract 1, identified in the record as the parties named in exhibit 4, are as such liable to Arthur H. Hafeman for the amount of the royalty payments erroneously made to the other royalty owners between the commencement of production and April 5, 1955, in the amount as found by the district court.

The judgment should be and is affirmed except as to the determination of the district court that the owners of a leasehold estate in Tract 1 are not as such liable to Arthur H. Hafeman for the amount of royalty payments erroneously made to the royalty owners other than Arthur H. Hafeman between the commencement of production of oil from said tract and April 5, 1955, which determination should be and it is reversed and the cause is remanded with directions that the district court for

Kimball County render a judgment in this case in favor of Arthur H. Hafeman and against Gem Oil Company, Dean Terrill, and the said owners of the leasehold estate in Tract 1, and each of them, for the amount of royalty payments erroneously made as aforesaid in the period from the commencement of the production of oil until April 5, 1955, in the amount of such payments as found by the district court in this cause, to wit: $19,-081.70, with interest thereon at 6 percent per annum on the respective amounts of royalty wrongfully paid from the respective dates of the payments.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED WITH DIRECTIONS.