Hilda FOERTSCH, Plaintiff-Appellant,

v.

Warren A. SCHAUS and Wanda G.
Schaus, Defendants-Appellees.

No. 1–684A155.

Court of Appeals of Indiana,
First District.

April 30, 1985.

Rehearing Denied June 11, 1985.

Gary Becker, Zoercher, Becker & Huber, Tell City, for plaintiff-appellant.

James E. Fields, Perdue & Fields, Evansville, for defendants-appellees.

NEAL, Judge.

## STATEMENT OF THE CASE

Plaintiff-appellant, Hilda Foertsch (Foertsch), appeals from a negative judgment of the Spencer Circuit Court in favor of defendant-appellees, Warren A. Schaus and Wanda G. Schaus (Schaus), in Foertsch's suit for damages and enforcement of an agreement regarding the division of oil royalties between the parties.

We affirm.

## STATEMENT OF THE FACTS

On October 29, 1959, George and Hilda Foertsch, husband and wife, owned some 176.5 contiguous acres of land in Posey County, Indiana, 156.5 of which, on that day, became the subject of an oil and gas lease containing the following "entirety clause":

"If the leased premises are now, or shall hereafter be, owned in severalty or in separate tracts, the premises nevertheless shall be developed and operated as one lease, and all royalties accruing hereunder shall be treated as an entirety and shall be divided among, and paid to, such separate owners in the proportion that the acreage owned by each such separate owner bears to the entire leased acreage: Provided, however, if the leased premises consist of two or more non-abutting tracts, this paragraph shall apply separately to each such non-abutting tract,

and further provided that if a portion of the leased premises is hereafter consolidated with other lands for the purpose of operating the consolidated tract as one lease, this paragraph shall be inoperative as to such portion so consolidated."

This lease is still in force and is currently held by J & M Oil Company. Ashland Oil, Inc. (Ashland) is the purchaser of the crude oil produced from the wells covered by the lease.

On May 8, 1968 Foertsch sold and conveyed to his nephew Schaus, by general warranty deed, a 60-acre tract off the south side of the 176.5 acres, 40 of which are contained in the leasehold. The deed reserved no interest to Foertsch but was specifically made "subject to lessees' interests in and to [the] oil and gas lease ... dated October 24, 1959". Also on May 8, 1968, the parties executed a collateral agreement stating, in pertinent part:

"... it is the desire of said Foertsch and the said Schaus not to be bound by the terms of said oil and gas lease insofar as it pertains to the usual entireties clause concerning division of royalties in the event the leased premises are ever owned in severalty or separate tracts:

&ast; &ast; &ast; &ast; &ast; &ast;

1. That said entireties clause of said oil and gas lease shall be inoperative and of no force and effect and said [lessors'] royalties shall not be divided or apportioned, but, instead, shall be paid to the landowner in accordance with the production from the separate tracts.

2. That the royalty payment due under the aforementioned oil and gas lease in respect to the lands this date purchased by Schaus from Foertsch shall be the absolute property of Schaus, the same as if said lands were leased under a separate lease.

3. That any royalties due the said Foertsch in connection with said oil and gas lease aforementioned in respect to the lands now owned by Foertsch shall be the absolute property of Foertsch, the same as if said abovementioned 60 acres had not been included in said lease."

Schaus knew the oil and gas lease existed but did not see or read it until one month before trial in 1983. Schaus testified that at the time he signed the 1968 agreement, he understood he was to receive royalties from the oil produced solely on his land, however, he did not understand how this was to be accomplished.

When Schaus acquired his property, on it were one producing oil well within the lease acreage and one water injection well[1] on the excluded twenty acres. Four producing wells had been drilled on the land retained by Foertsch. The lease operators continued to develop the property as one leasehold estate after 1968, undertaking a water-flooding operation, drilling more producing oil wells and water injection wells; however, little oil was recovered until 1974. By the date of trial there existed on Foertsch land eight producing wells and five water injection wells, and on Schaus land there existed one producing well and three water injection wells, two of which lie outside of the lease acreage.

Schaus testified that disagreements arose between the parties soon after the 1968 agreement; Mr. Foertsch continually accusing Schaus of stealing his oil and Schaus complaining the water injection wells on his side of the land were pushing oil over into wells on the Foertsch side of the road. Several times Schaus requested the operator of the field to change its operation and divide the north and south oil but the operator refused because it would cost too much and ruin the field.

Schaus received no oil royalty monies in 1968. Sometime between August 22, 1969, and March 18, 1970, the exact date is not known, Foertsch and Schaus signed a transfer order[2] directed to the purchaser of their oil, Ashland. That corporation had divided the leasehold into two production areas designated Lease No. 40231, consisting of 136.5 acres, and Lease No. 40230, containing the remaining 20 acres. The transfer order stated Foertsch (the transferor) "sold and transferred" to Schaus (the transferee) a $^{10}/_{20} \times \frac{1}{8}$[3] royalty interest in Lease No. 40230, ten of which acres are on Foertsch land and ten on Schaus land, each ten-acre tract having a producing oil well thereon. Further, the transfer order lists a $^{30}/_{136.5} \times \frac{1}{8}$ royalty interest for Schaus in Lease No. 40231, which includes the remaining thirty (30) acres of Schaus land covered by the original lease. At the time of trial, Lease No. 40231 contained 7 producing wells, all of which are on the 106.5 acres belonging to Foertsch.

Following the execution and processing of the transfer order in 1970, Schaus began to receive monies from Ashland. Some of these payments were applicable to oil produced in 1969, however, the royalties had been held by Ashland in a suspense account until it was advised of the proper division through the transfer order. Upon Schaus' receipt of royalties, he attempted to "settle up" with Foertsch for amounts he believed were due Foertsch for production in 1968 and 1969. Using figures arrived at by estimating the percentage of oil produced by his land during those years, Schaus made one lump sum payment to Foertsch after dividing approximately six months' worth of royalty checks.

Thereafter, the parties accepted their respective royalty payments from Ashland, computed according to the transfer order, without further quarrel through 1974, when Mr. Foertsch died. In 1975 after oil production from Lease No. 40230 and 40231 had increased substantially, Roy

---

1. Water injection wells are used to flush scattered oil deposits together toward a producing well.

2. Normally, where more than one owner/lessor exists at the time the leasehold is formed, the purchaser will require all to sign a division order designating the percentage royalties each owner is entitled to receive, according to the percentage of land each owns in the leasehold.

When an original owner assigns or transfers a portion of his royalties, or his right thereto, a transfer order is executed.

3. One-eighth ($\frac{1}{8}$) is the standard royalty interest reserved to the owner/lessor of an oil and gas lease. Ten-twentieths ($^{10}/_{20}$) represents the number of acres out of the total number of lease acres owned by Schaus.

Foertsch, the son of Hilda and George, telephoned Schaus regarding his 1968 royalty division agreement with Foertsch. Although Hilda Foertsch was not discontented with the division under the transfer order, Roy believed she was entitled to much more under the 1968 agreement, which it is alleged Schaus breached. In 1976, an attorney for Foertsch wrote a letter to Schaus requesting him to honor the 1968 agreement. Schaus refused. From 1970 through June 30, 1983, Ashland paid royalties to Foertsch and Schaus in the amounts of $304,234.00 and $75,831.00 respectively.

Foertsch filed her initial complaint on February 23, 1977, and amended it on August 10, 1982, requesting damages in the amount of royalties wrongfully paid to Schaus under the transfer order; that Schaus be ordered to comply with the 1968 royalty division agreement; and that separate measuring tanks be installed to facilitate the division. A bench trial was conducted on August 31, 1983, and judgment was entered in favor of Schaus on March 26, 1984. Foertsch appeals from this ruling.

### ISSUE

Foertsch, who lists three issues for review, has misconstrued to her advantage the only true question presented and argued in this appeal, which is:

Whether the trial court erred in upholding the operation of the transfer order to divide oil royalties between Foertsch and Schaus.

### DISCUSSION AND DECISION

Contrary to Foertsch's standpoint, oil and gas law is applicable to this case, which cannot be determined according to contract law alone. Foertsch asserts the agreement signed by the parties in 1968, stating oil royalties would be divided between them according to production from their separate tracts and not pursuant to the entirety clause in the lease, is a valid and legally enforceable instrument. That agreement has never been altered or mod-

ified and the parties signing of the transfer order did not accomplish this. Therefore, Schaus breached the 1968 agreement by failing to continue to divide the royalties he received after he paid the lump sum amount to Foertsch in 1970. We disagree. As a matter of law, in order for Foertsch to prevail, the deed and agreement between Foertsch and Schaus must be effective to take the conveyance out of the operation of the entirety clause in the lease. The agreement must further override the provisions of the transfer order executed in 1970.

As oil and gas matters are not common place in Indiana, our decision here is one of first impression and relies heavily on the wisdom and experience of those jurisdictions which have dealt with our present situation.

First, based upon *Fairbanks v. Warrum*, (1913) 56 Ind.App. 337, 104 N.E. 983, we make the following analysis of the legal relations resulting from execution of an oil and gas lease, which is the starting point for our decision. The general rule is where no entirety clause is involved the lessor, as owner of the fee, owns all of the oil beneath the surface of his acreage. But, because of the fugitive nature of oil, which can flow from and to adjoining lands, the lessor owns the oil only in a qualified sense. Absent an oil and gas lease, the landowner has a right to explore and drill for oil on his land and any such oil produced is thereby reduced to his personal property, even if it flows from adjoining lands. When the lease is executed, the lessor does not convey title to the oil under his land, for that is an interest in real estate. The lease creates in the lessee an exclusive right to explore and reduce the oil to lessee's possession, at which time it becomes his personal property and the lessor retains only a royalty interest in it. Under the lease the lessee has sole discretion to drill wells at any point on the leased premises to operate the field in the most productive and efficient manner. The lessor retains the right to the surface, subject to the lessee's right of ingress to and egress from the sub-surface, a reversionary interest in any

oil remaining after the termination of the lease, and a right to royalties on oil produced by the lessee during the term of the lease. Each of these interests may be independently conveyed or assigned by the lessor.

When the lessor conveys a fee simple portion of the leased premises he may transfer no more than he has; that is, his rights to the surface, a reversion in the oil, and a royalty interest in oil produced by the lessee on the devised tract, if and when the lessee chooses to drill a well thereon. The grantee may not put down wells on his land for the term of the lease as such is the exclusive right of the lessee, under his previous contract. Neither the lessor nor his grantee may interdict the right of the lessee to control oil production. Therefore, both the lessor and his grantee have only an immediate right to royalties from oil pumped by the lessee from wells located on the surface land of each.

The above is known as the rule of non-apportionment of royalties and is generally followed today. Put another way,

"... in the absence of an express agreement or controlling valid governmental regulations, the owners of mineral interests under a portion of land subject to an oil and gas lease are entitled to all of the rents and royalties accruing from the production of oil or gas from that land even though the lease may cover other tracts."

*Rauner v. Jones*, (1954) 159 Neb. 385, 67 N.W.2d 347, 350.

An entirety clause in an oil and gas lease alters the basic legal relations set forth in *Warrum, supra.* Apportionment of royalties results by stating the lease shall be operated as one unit and "all royalties accruing ... shall be treated as an entirety, and shall be divided among ... such separate owners in the proportion that the acreage owned by each separate owner bears to the entire leased acreage." With an entirety clause, when the lessor conveys a fee simple portion of the leased premises the grantee has an immediate right only to his percentage of the royalties from the entire leasehold, the deferred reversionary interest in any oil remaining after the termination of the lease, and a right to the surface acreage. The grantee is not entitled to develop the oil under his tract and may not claim the sole right to royalties on oil drilled by the lessee thereon. *See* R. Hemingway, *The Law of Oil and Gas*, Sec. 9.5 (1971).

An entirety clause benefits the lessee by defining his duties and many times allowing him to develop the lease in the most effective and economical manner; it avoids the necessity of the lessee providing separate measuring or metering devices and separate receiving tanks for each individually owned tract. *See Continental Oil Company v. Blair*, (1981) Miss., 397 So.2d 538. Thus, he may place wells on any spot located on the field and may use means to push the oil to these wells without injuring the various landowners' interests. Such a provision creates a basis for good will between the lessee and the lessors and among the lessors. *See Krone v. Lacy*, (1959) 168 Neb. 792, 97 N.W.2d 528. Where multiple subdivisions of the leasehold occur the lessee may avoid potential difficulties in development; the owners of the separate tracts would be treated fairly and equitably regardless of the methods used by the lessee. Finally, the lessee would not be caught between the conflicting claims and charges of favoritism and fraud by owners, and the ensuing expensive, time-consuming and debilitating litigation.

The oil and gas lease in the present case contains an entirety clause and thus, royalties were to be apportioned between Foertsch and his successor in 40 leasehold acres, Schaus. However, Foertsch attempted to avoid apportionment through provision in the deed and the separate agreement, both executed in 1968.

A conflict exists as to whether a lessor may convey an interest in land subject to a lease containing an entirety clause which would have the effect of placing the conveyed tract upon a non-apportionment ba-

sis. The weight of authority is that he may not. *Krone, supra; Turner v. Brookshear,* (10th Cir.1959) 271 F.2d 761; *Cockrell v. Texas Gulf Sulphur Company,* (1956) 157 Tex. 10, 299 S.W.2d 672; *Hafeman v. Gem Oil Company,* (1956) 163 Neb. 438, 80 N.W.2d 139; *Rauner v. Jones,* (1954) 159 Neb. 385, 67 N.W.2d 347; *Eason v. Rosamond,* (1935) 173 Okl. 10, 46 P.2d 471; *Schrader v. Gypsy Oil Company,* (1933) 38 N.M. 124, 28 P.2d 885; *Gypsy Oil Company v. Schonwald,* (1924) 107 Okl. 253, 231 P. 864. It appears the above courts have reached the same conclusion based on different lines of reasoning. In *Cockrell,* the Texas Supreme Court held the owners, without the joinder and approval of the lessee, could not defy the entirety clause in the lease and place the royalty payments on a non-apportionment basis. Where a subsequent deed is made "subject to" an oil and gas lease, the lease modifies the deed. *Schrader, supra.* In the case at bar, the lessee was not joined in the 1968 agreement to divide royalties on a non-apportionment basis, and the deed from Foertsch to Schaus was expressly made subject to the lease. However, we find even stronger support for upholding the present entirety clause in that line of cases holding such lease provision is a covenant running with the land, which restricts the power of the lessor to subsequently alienate the mineral estate free of the entirety clause. *Krone, Turner, Hafeman, Rauner, Gypsy v. Schonwald, supra.*

▬▬▬▬▬ Although no case law exists in Indiana regarding the treatment of entirety clauses, our courts have long dealt with oil and gas lease provisions regarding rents and royalties as covenants running with the land. *See Heller v. Dailey,* (1902) 28 Ind.App. 555, 63 N.E. 490; *Breckenridge v. Parrott,* (1896) 15 Ind.App. 411, 44 N.E. 66; *Edmonds v. Mounsey,* (1896) 15 Ind.App. 399, 44 N.E. 196. As Professor Summers has stated, it follows that an entirety clause, which is an agreement respecting the apportionment and payment of rents and royalties, must also be a covenant running with the land. 3A, W.L. Summers, *The Law of Oil and Gas 2d,* Sec. 609

(1954). In *Gypsy v. Schonwald,* the court found as an incedent of ownership, a lessor may voluntarily so choose to burden his right to transfer his property; that an entirety clause is,

> "... as to subsequent agreements of sale, tantamount to a severance of the owner's estate in the oil and gas mineral from the estate in the land itself, and the covenanting that owners of a fraction of the whole estate in either should share in the [royalties] as per [such] pro rata clause."

231 P. at 868.

Thus whether a mineral interest plus surface land or a mineral interest only is transferred, is irrelevant to the application of an entirety clause. Nor does the fact that the tracts involved are non-contiguous have any bearing on the legal effect of the provisions of a lease. *Rauner, supra.* Thus the various cases we shall refer to apply equally to our situation where Foertsch conveyed all of his rights in 40 of 156.5 contiguous leasehold acres to Schaus.

*Rauner, supra,* presents a fairly straightforward fact situation and an excellent review of the case law in the area of entirety clauses. Rauner owned two tracts of unequal size and entered into an oil and gas lease covering the whole premises. The lease contained an entirety clause. Thereafter, Rauner conveyed to Jones a fractional mineral interest in the larger tract, subject to the rights of the lessee. The mineral deed stated it gave Jones all rights to royalties from a number of leasehold acres as if he had been the landowner when the lease was executed. Oil was ultimately produced only from the smaller tract which Rauner owned individually. Rauner wished to preclude Jones from receiving any royalties generated. The Nebraska Supreme Court found the mineral deed was intended only to convey all rights to those specific mineral acres described, without regard to the pro rata provision in the lease. However, the entirety clause in the lease was superior to the subsequent deed and Jones was thereby entitled to a

proportion of the royalties equal to the percentage his mineral acres bore to the entire leasehold.

In *Krone, supra,* Lacy became the owner of two small tracts subject to an oil and gas lease covering some 2000 acres and containing an entirety clause. Lacy later conveyed fractional mineral interests therein to Krone, also subject to the lease. A side memorandum was executed supporting non-apportionment of any royalties from oil produced thereunder. These arrangements were ratified by the other owners of mineral interests in the lands. Krone wished to enforce the deed and side agreement because the majority of the oil produced from the leasehold came from wells on the two tracts. The court again found the parties intended the conveyances to cover only oil and gas produced from the two tracts mentioned in the deed. However, the court found the true issue to be whether the owners of all royalty interests under a lease containing an entirety clause may agree among themselves for a different division of royalties than that fixed by the entirety clause and, if they do, is such agreement enforceable among themselves. This must be the first question answered in the case at bar, where Foertsch and Schaus agreed to divide royalties on a non-apportionment basis in defiance of the entirety clause in the lease. The court in *Krone* found the lessors, by executing the lease containing an entirety clause, restricted their power to alienate any part of their estate in the land covered by the lease except in accordance therewith. As the entirety clause is a covenant running with the land, it equally encumbers all who subsequently receive an interest in the land, for the duration of the lease. Citing *Hafeman, supra,* the court stated "[t]he entirety clause was not intended to be and is not divisible. The obligation to pay royalties of necessity includes the duty to pay them as required by the entirety clause. This duty is extended, not divided, by an assignment of a portion of the leasehold". 97 N.W.2d at 534. The court concluded the lessors and all parties holding under or through them could not, by agreement among themselves, make a change affecting the apportionment of royalties provided for by the entirety clause in the lease. Acceptance of a conveyance subject to the lease implies agreement by the grantee to the application of the entirety clause. Thus, Krone was entitled to receive only a fraction of the ⅛ royalty from any and all oil produced on the entire leasehold and could not exclude the owners of other tracts therein from sharing in the royalties from production on his acres.

Thereafter, Krone filed suit in federal court alleging breach of agreement to transfer oil royalties and requesting damages in the amount of royalties paid to others from oil produced on his land. *Krone v. Lacy,* (8th Cir.1962) 305 F.2d 245. The court affirmed the district court's grant of summary judgment in favor of Lacy, stating the highest state court had previously ruled the parties' agreement to transfer royalties and the mineral deeds were ineffective to convey what had been intended. Thus, the matter was determined res judicata.

We hold the 1968 agreement entered into by Foertsch and Schaus was ineffective to change the division of royalties established by the entirety clause in the oil and gas lease, even though both parties intended royalties to be paid on a non-apportionment basis. To permit otherwise would generate chaos; an unworkable, inequitable situation as the facts here demonstrate. The side agreement purported to divide oil; that produced on Foertsch's land from that on Schaus' and to pay royalties accordingly. In effect, Foertsch and Schaus attempted to manipulate something over which they had no immediate control, production and development of the leasehold. Even ownership of the oil was relinquished once it was produced by the lessee. All Foertsch and Schaus had a right to immediately divide and deal in was a proportion of the royalties, the reversion in the oil and the surface acreage.

■ Thus, Schaus could not have breached the 1968 agreement. *Krone, supra.* The fact Schaus was not familiar with all the specific provisions in the lease at the time the deed was executed is irrelevant, as he is charged with knowledge of the lease contents and the lessee's rights by accepting the deed subject thereto. *Turner, supra. Harley v. Magnolia Petrolium Co.,* (1941) 378 Ill. 19, 37 N.E.2d 760.

As mentioned previously, authority to the contrary does exist. In *Alsip's Administrator v. Onstott,* (1955) Ky., 283 S.W.2d 711, the lessor conveyed 16 of 130 acres subject to an oil and gas lease containing an entirety clause. However, the lessor reserved the right to all royalties under the lease and the court ruled the deed modified the lease relating to proportional royalties. *Bascom v. Maxey,* (1945) 195 Okl. 259, 157 P.2d 158 dealt with the opposite situation. There, the court ruled the lessor/grantor, through a provision in a mineral deed, intended the grantee to receive all royalties even though the lease contained a type of entirety clause. The deed was enforced and the court pointed out that division was no problem as the only producing well was on the grantee's land and the lessee had been paying royalties without regard to the entirety clause for several years.

Two other cases dealing only with the assignment of royalty interests for the duration of the lease and no interest connected with the land are *Iskian v. Consolidated Gas Utilities Corp.,* (1952) 207 Okl. 615, 251 P.2d 1073, and *Shell Petroleum Corporation v. Carter,* (1937) 187 La. 382, 175 So. 1. In these, the specific assignments were enforced as opposed to the entirety clauses. In *Shell,* the court stressed the purchaser of the royalty interest chose that tract of land which he hoped would be more likely to produce and he should not recover from others who are entitled to receive nothing less than the royalty interest they purchased. In neither case was the assignment of the royalties made "subject to" the oil and gas lease involved. *Iskian* was distinguished from a situation where the lessee's operation of the lease would be hindered if the entirety clause was not upheld, and stated a different rule would prevail if production was obtained from other portions of the lease. *Krone, supra,* criticizes *Iskian* on this point, stating the possible injury to the lessee and extent of development to date should be irrelevant because the lessor voluntarily agreed to the inclusion of the entirety clause which extends the life of the lease. We find *Krone's* logic persuasive, as production patterns are subject to change and uniformity should prevail over all property transfers made throughout the term of a lease. However, our ruling here is not to be construed as a prohibition against parties assigning accrued royalties, as such are choses in action, and not interests in real estate.

One federal case stands alone, where reformation of mineral deeds was permitted so as to make them not subject to an oil and gas lease. *Coyne v. Simrall,* (6th Cir.1944) 140 F.2d 574, *cert. denied* 323 U.S. 723, 65 S.Ct. 56, 89 L.Ed. 581.[4] The court applied Michigan law to correct a mutual mistake of the parties to the deeds in order to give the purchasers their bargained-for royalty interests to oil produced from the land covered by the deeds. It was emphasized the ruling was made to deny those grantees who had paid no consideration for their interest, a share of the royalties contracted for by bona fide purchasers. However, the purchasers were aware of the existence of the oil and gas lease which was properly recorded, when the deeds were executed and ignorance of the specific provisions thereof would not be a defense under Indiana law. *See generally Mettart v. Allen,* (1894) 139 Ind. 644, 39 N.E. 239.

---

**4.** In most cases where mineral deeds have been executed subsequent to an oil and gas lease without knowledge of the entirety clause in the lease reformation has been denied. *See Segelke v. Kilmer,* (1961) 145 Colo. 538, 360 P.2d 423; *Turner, supra; Hafeman, supra; Harley v. Magnolia Petroleum Co.,* (1941) 378 Ill. 19, 37 N.E.2d 760.

■ We further agree with *Continental Oil, supra,* that even absent an entirety clause, basic contract law prohibits the lessor from unilaterally increasing the burden on and duties of the lessee to develop a leasehold by subsequently transferring and subdividing the land under the lease. *See* 2 Williams & Meyers, *Oil and Gas Law,* Sec. 521.3 (1980). Continental quotes *Felmont Oil Corporation v. Pan American Petroleum Corporation,* (1960) Tex.Civ.App., 334 S.W.2d 449, 453, stating:

> "On the date that the two basic leases were executed and delivered, the lessee ... owed to the lessor ... only the obligations contained in the two leases, either expressly or by implication.... Since the lessor may not, himself, arbitrarily separate or subdivide the express or implied obligations imposed on the lessee by the terms of the lease, it follows that such lessor would not be permitted to accomplish this indirectly, by the sale of the minerals to numerous parties in segregated tracts and parcels, and thus subdivide what was theretofore a single unified obligation affecting the lease as a whole into countless separate obligations, each of which would be subject to further fractionization or division in the event of further sales by the purchasers thereof."

397 So.2d at 542. *See also Martin v. Graf,* (1942) 289 Ky. 272, 158 S.W.2d 637. Schaus requested the lease operator to separate production on his land from that of Foertsch several times. Each time the operator refused, as such would involve great expense in drilling extra wells which were unnecessary to his efficient operation of the lease. The operator testified each new well would cost $25,000 and a separate measuring tank would be $7,500 and that less oil would be recovered if the tracts were divided. The lessee bargained for the right to operate the lease in the most beneficial and economical manner possible. Foertsch has no authority to unilaterally contract away that right. It is to be noted that Foertsch's prayer in her complaint asked that the court order tanks and measuring facilities to be installed so that the agreement could be enforced.

Next we come to the issue of the transfer order executed by Foertsch and Schaus in late 1969 or 1970. Foertsch contends this only prevents her from filing suit against Ashland for its division of royalties in accordance therewith, not from suing Schaus for that amount they wrongfully received under the transfer order.

■ A division or transfer order sets out that portion of production to which each owner under an oil and gas lease is entitled. It provides direction and authorization to the purchaser of the oil to pay royalties accordingly. Where all owners sign the order, the purchaser is protected from liability for so paying even though the division set forth may be incorrect. *Chicago Corporation v. Wall,* (1956) 156 Tex. 217, 293 S.W.2d 844; *Wagner v. Sunray Mid-Continent Oil Company,* (1957) 182 Kan. 81, 318 P.2d 1039. Foertsch is correct in stating she is not estopped to assert her correct royalty interest as against Schaus, if Schaus had been receiving a disproportionate share. The execution of a transfer order operates as a contract between the landowners and the oil purchaser; not among the landowners. *Wagner, supra; Hershey v. Hershey,* (1954) 3 Ill.App.2d 307, 122 N.E.2d 69; *Hafeman, supra.*

■ However, we find that Schaus was not accepting royalties greater than the amount he was entitled to. "A division order does not supersede the lease by operating as a novation as to the royalty." *Hafeman, supra,* 80 N.W.2d at 151, citing Sullivan, *Handbook of Oil and Gas Law,* p. 142. *See also Dale v. Case,* (1953) 217 Miss. 298, 64 So.2d 344. A division order does not change the lease but "... merely reflects the interest of the parties as created by the lease". *Stanolind Oil and Gas Co. v. Terrell,* (1944) Tex.Civ.App., 183 S.W.2d 743. Where an entirety clause exists in the lease, the division order should be drafted accordingly. *See Harley, supra.*

In the present case, the lease contained a valid entirety clause, the deed was specifically made subject to the lease and royalties accruing from the production of oil on the leasehold should be apportioned according to the percentage acreage owned by Foertsch and Schaus.

The transfer order designated two production areas and correctly states the proportionate interests of Schaus and Foertsch therein. Foertsch requests that Schaus receive no royalty from production under Lease No. 40231, as no producing well exists on Schaus land covered by that designated area. However, Schaus does own land covered by that lease designation and is entitled to a proportionate amount of royalties.

■ Foertsch misconstrues Schaus' attempt to "settle up" for past royalties in 1970 as an effort to uphold their 1968 royalty division agreement after the execution of the transfer order. Schaus testified he was trying to divide the royalties withheld before the transfer order was signed, which were attributable to production in 1969. Such is proper, as a transfer order is effective from the date of execution and does not relate back to oil previously produced but not yet paid for. *Houston Lighting & Power Co. v. Liberty Pipe Line Co.*, (1934) Tex.Civ.App., 71 S.W.2d 393; *Ameranda Petroleum Corporation v. Melton*, (1929) 139 Okl. 119, 281 P. 591. The fact that Schaus improperly included in his computation some royalty checks for oil produced subsequent to the transfer order is both understandable and excusable. As expressed in *Dale* and reaffirmed in *Hafeman, supra*, "It require[s] very considerable knowledge of and proficiency in mathematics and more than slight technical training to determine [one's royalty share] from the mineral deeds and the long and involved provisions of the base lease". Further, "[t]he fractions appearing on the reverse side of the division orders which [were] signed might have puzzled the mind of a bank president who was accustomed to dealing in figures of that kind". 80 N.W.2d at 152.

That the trial court decided this case on the equitable ground of "doing that which ought to be done" as opposed to the law pertaining to oil and gas matters is of no consequence. Foertsch appeals from a negative judgment and we find that all the evidence leads to the conclusion reached in the trial court's judgment. *See Arnold v. Dirrim*, (1979) Ind.App., 398 N.E.2d 426.

In conclusion, we find as a matter of law when Foertsch executed the lease he parted with immediate, effective control of the oil production under the leasehold. He thereafter had no right or discretion, without the lessee's consent, to make any agreement regarding oil production or the division of royalties inconsistent with that lease, which contained an entirety clause. The entirety clause is not divisible; that is, applicable to production methods, but not applicable to payment. Nor is it made divisible by transfer. Schaus, who took from Foertsch subject to the lease is equally bound. As the entirety clause is a covenant running with the land, all who receive a property interest through the lessor must be so restricted for the term of the lease. The transfer order does not state a division of royalties disproportionate to the percentage of the total acreage each party owns and does not change the entirety clause's operation. Therefore, the royalty amounts paid to Foertsch and Schaus by Ashland accordingly are not incorrect in that Schaus is entitled to a royalty interest in the oil produced both from the acreage designated Lease No. 40230 and 40231. For the above stated reasons, this cause is affirmed.

Judgment affirmed.

RATLIFF, P.J., and ROBERTSON, J., concur.