In the
United States Court of Appeals
For the Seventh Circuit

No. 00-2190

C. James Youngs,

Plaintiff-Appellant,

v.

Old Ben Coal Company,

Defendant-Appellee.

Appeal from the United States District Court
for the Southern District of Indiana,
Evansville Division.
No. 97 C 148--Richard L. Young, Judge.

Argued January 19, 2001--Decided March 15, 2001

   Before Flaum, Chief Judge, and Posner and
Ripple, Circuit Judges.

   Posner, Circuit Judge.  C. James Youngs,
the owner of a 400-acre tract of land on
which the Old Ben Coal Company has strip-
mining rights, brought this diversity
suit (governed by Indiana law) against
Old Ben for breach of contract, lost
after a bench trial, and appeals. Old Ben
caused the four oil wells on the land to
be plugged, and later, having removed all
the surface coal, ceased its coal-mining
activities. Youngs seeks specific
performance of what it claims to be Old
Ben's contractual obligation to restore
the oil wells once Old Ben ceased its
mining activities. Whether Youngs has
such a right depends in the first
instance on a series of contracts
allocating rights in the tract in
question.

   A fee simple in mineral-bearing land is
actually a bundle of separate property
rights, or as they are sometimes called
"estates," and the rights can be owned by
different persons. In 1949, the then
owner of the entire fee simple leased to
Bernard Bouchie the oil and gas estate in

the land, that is, the right to extract oil and gas. The lessee was actually one of Bouchie's predecessors, but that is one of a number of distracting and irrelevant details that we shall ignore in order to simplify our opinion. This 1949 lease is broadly worded and includes a grant to the lessee of "the right at any time to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing" (that is, pipe). The estate itself, however, remained a part of the fee simple.

In 1956, the fee simple, with the exception of the oil and gas estate, was sold to Youngs. The sale was expressly subject to the 1949 lease of oil and gas rights. In addition, the deed required the buyer, that is, Youngs, along with his successors and assigns, in the event that he or they took any oil wells "out of production," "to restore . . . said wells to production in substantially the condition that . . . they were in prior to taking . . . them out of production."

In 1959 Youngs, whose fee-simple interest included the coal estate in the land, leased that estate, together with the coal estate in adjacent parcels owned by him, to Old Ben, subject to various encumbrances, including the 1949 oil lease and the restoration obligation in the 1956 deed. The 1959 lease expressly grants Old Ben the right to strip mine the property and hence to destroy the surface, destroy any structures (after due notice to their owner) on the surface, and destroy everything else down to the seam of coal to be mined, including any oil wells drilled pursuant to leases executed after this lease (that is, the 1959 coal lease). Youngs's exploitation of any other mineral estates in the property was expressly subordinated to Old Ben's rights under the lease.

Youngs did not own the oil and gas estate in 1959, because it had been excepted from the grant to him of the fee simple in 1956. But he acquired that estate in 1975 and shortly afterwards sold the fee simple in the 400-acre tract to Old Ben, while reserving as his predecessor had done the oil and gas estate. The reservation was expressly subordinated to Old Ben's rights under

the 1959 coal lease.

The upshot is that from 1975 on, Old Ben owned all the estates in the tract except the oil and gas estate, which remained in Youngs's hands; and Bouchie was the lessee of that estate, operating the four oil wells.

The production from the oil wells dwindled. No oil was produced after March 1989, and the last royalty payment, made by Bouchie to Youngs for 1989, was for only $155. The previous year, 1988, it had been $163, down from $3,941 in 1983.

Old Ben wanted to strip mine the area occupied by the four wells, so in 1992, with the oil wells unused, it paid Bouchie, the lessee of the oil and gas estate under the 1949 lease, to remove the surface facilities (pumps, pipes, and storage tanks) and plug the wells. It then proceeded to strip mine the land formerly occupied by them. So far as appears, the price that Bouchie charged Old Ben for the removal did not include compensation for any loss of oil production. There was no such loss, because production had already ceased.

The strip mining of the areas occupied by the wells was completed at some time prior to 1995, the year that Youngs discovered that the wells had been plugged and demanded that Old Ben restore them. Old Ben refused, precipitating this suit.

An initial peculiarity about the suit is that the 1956 grant, by which Youngs acquired the 400-acre tract, required him to restore the oil wells after coal production ceased--yet the suit has him seeking to impose that obligation on Old Ben. The key date, however, from Youngs's point of view, is 1975, when he acquired the oil and gas estate and therefore became the obligee under the restoration clause. The purpose of that clause in the 1956 grant was to obligate the owner of the other rights in the land, including most importantly the right to strip-mine coal, to restore the oil wells, for the benefit of the owner of the oil and gas estate when the interfering uses, such as strip mining, ceased, so that the production of oil could resume. In 1975 Youngs became the owner of the oil and gas estate and thus the beneficiary of

the restoration obligation. He argues that Old Ben, as the coal operator, became the obligor, since both the coal lease, which was the original source of Old Ben's rights, and the deed by which Old Ben acquired all the estates in the land except the oil and gas estate from Youngs in 1959, were expressly subject to the restoration obligation.

There are several fallacies in this argument. The first is that it overlooks Bouchie's rights. Youngs's acquisition, first of the 400-acre tract (1956) and then of the oil and gas estate in the tract (1975), were subject to Bouchie's preexisting rights conferred by the 1949 lease that he had obtained from the then owner of the oil and gas estate. Those rights, which later contracts to which Bouchie was not a party could not extinguish, included the right to demolish the oil wells with no obligation to restore them. So if when the oil wells ran dry Bouchie decided to demolish them Youngs could not object. But that is exactly what happened--when the oil wells ran dry, Bouchie decided to demolish them. True, he was persuaded to this decision by Old Ben's money. Bouchie had no incentive to incur the expense of removing the wells, other than those parts that might have salvage value, and perhaps there were none; Old Ben did, to enable it to strip mine the land that the wells occupied. And so the stage was set for a mutually advantageous deal between Bouchie and Old Ben.

We do not understand how Bouchie's right to remove the wells could be thought conditional on his deciding to do so exclusively for his own purposes rather than at the behest of someone else, who wanted to use the land that the wells occupied. Nothing in the 1949 lease would have prevented Bouchie from assigning the lease to Old Ben, which could then have hired Bouchie or anyone else to do the actual removal. Youngs could not have blocked that transaction, and what difference can it make that instead of bothering with an assignment Bouchie and Old Ben contracted directly for the removal of the wells? Youngs argues that under Indiana law an oil and gas lease lapses after one year of nonproduction, which in the case of Bouchie's lease would have been sometime early in 1989. The argument is unsound. After one year

of nonproduction, the owner of the oil and gas estate can file a statement with the county recorder that the lease has expired. Ind. Code sec. 32-5-8-1; Wilson v. Elliott, 589 N.E.2d 259, 262 (Ill. App. 1992); Salmon v. Perez, 545 N.E.2d 21, 24 (Ill. App. 1989) ("the statute requires a one-year period of inactivity and a written request of the property owner before an oil and gas lease will become null and void"). But Youngs never did this. And so the lease was still in force in 1992 when Old Ben contracted with Bouchie for the removal of the wells.

Even if the lease had terminated in 1989, Bouchie would have been entitled to a reasonable time within which to exercise his right under it to remove the wells, a right that by its nature persists after the expiration of the lease by reason of nonproduction--the lessee cannot reasonably be required to exercise his right of removal while the wells are still producing. The lease authorized Bouchie to remove fixtures, machinery, and casing "at any time," a standard phrase in so-called "removal of equipment clauses" and one that courts have interpreted as authorizing the lessee to remove the equipment before or after the lease expires, so long as the removal is done within a "reasonable time." Hardy v. Heeter, 96 N.E.2d 682, 684 (Ind. App. 1951); Smith v. Mesel, 84 N.E.2d 477 (Ind. App. 1949); Michaels v. Pontius, 137 N.E. 579 (Ind. App. 1922); 4 Eugene Kuntz, A Treatise on the Law of Oil and Gas sec. 50.3, p. 293 (1990). Since there appears to be no more recoverable oil, and Youngs had indicated no intentions with regard to the use of the land after the end of oil production and strip mining, three years might well have been a reasonable time, though that we need not decide.

If the lease had terminated in 1989 and the wells had not been removed within a reasonable time thereafter, and if therefore they had been deemed abandoned and so had reverted to Youngs as the owner of the land to which they were affixed, Youngs might have a claim against Bouchie and Old Ben for having destroyed his fixtures. That is not the nature of his suit, but the issue of Bouchie's rights comes in indirectly. The suit is based on Youngs's express

reservation in the 1959 coal lease of the right of restoration in the 1956 conveyance. It is on that reservation that Youngs builds his argument that even if Bouchie was entitled to remove the wells, Old Ben could not do anything directly or indirectly to bring about their removal because in the deed that it received from Youngs in 1959 it had acknowledged its obligation to restore the wells to their pristine condition when it finished mining the coal.

But the 1959 conveyance, and any reservations in it, were subject to the 1949 lease. By virtue of that lease, Youngs could not prevent Bouchie from demolishing the wells without obligation to him until the lease was terminated, which did not happen, as we have seen; and that right of demolition would have been impaired had Bouchie been precluded from accepting Old Ben's money to pay for the demolition. This result can be avoided, without reading the restoration clause out of the 1959 conveyance, by interpreting the clause to concern leases on other parcels covered by the conveyance of the coal estate to Old Ben (for remember that Youngs owned, and conveyed to Old Ben the coal estate in, land adjacent to the land subject to Bouchie's oil lease) and future leases of oil rights on the 400-acre tract itself.

Suppose that in 1960 Bouchie had surrendered his lease, and the owner of the oil and gas estate (which, remember, had been carved out from the 1959 transaction, and came into Youngs's hands only in 1975) had granted another oil lease, say to X Drilling Company. Suppose that X had drilled several wells and produced oil, yielding royalties to the lessor. And suppose that later Old Ben, as the coal lessee, had paid X to remove the wells, as the coal lease of 1959 entitled it to do. If Old Ben then ceased mining the tract, it would be obligated to restore the wells. It wouldn't matter if the lease to X had not incorporated the restoration clause or that Old Ben might have paid X to demolish the wells. Old Ben's obligation to restore the wells under the restoration clause would depend only on its having ceased to mine for coal. It is true that this obligation would burden X, by making it less likely that X could shift the expense of demolishing the wells to someone else, namely Old Ben. But X would have acquired

its lease with notice of the other encumbrances on the property, including the owner's right to insist that his coal lessee restore any oil wells on the property to their pristine state when the lessee ceased mining. The terms of the lease would presumably have compensated X for the fact that this encumbrance might make the exercise of X's right to remove its wells more costly than it otherwise would be. X would still be free to remove the wells at its own expense; it just would be less likely to be paid to do so by Old Ben.

But Bouchie, having obtained his oil lease before the restoration clause entered the chain of title, did not hold the lease subject to the clause. He remained free by virtue of the priority of his lease to do anything he wanted with his oil wells--including accepting payment from Old Ben to demolish them. A conveyance of property is invalid to the extent the seller tries to convey an interest greater than he has. See, e.g., Ind. Code sec. 32-1-2-36; Crommelin v. Fain, 403 So.2d 177, 181 (Ala. 1981). Specifically, the conveyance of a fee simple does not extinguish an existing lease. Foertsch v. Schaus, 477 N.E.2d 566, 571 (Ind. App. 1985); Berman v. Sinclair Refining Co., 451 P.2d 742, 745 (Colo. 1969); Plastone Plastic Co. v. Whitman-Webb Realty Co., 176 So. 2d 27, 28 (Ala. 1965): Denco, Inc. v. Belk, 97 So. 2d 261, 265 (Fla. 1957). The restoration clause was subject to the earlier granted lease and could not give Youngs more rights than his grantor had.

So far we have treated the issue of the enforceability of the restoration clause against Old Ben as an issue of general contract and property law. See, e.g., Reese Exploration, Inc. v. Williams Natural Gas, 983 F.2d 1514, 1518-19 (10th Cir. 1993); Federal Land Bank v. Texaco, Inc., 820 P.2d 1269, 1271 (Mont. 1991); Bi-County Properties v. Wampler, 378 N.E.2d 311, 314 (Ill. App. 1978). But it is also an issue of oil and gas law, which by defining property rights in these resources simplifies the interpretation of contracts involving them. As the district court pointed out, under the oil and gas law of Indiana (and generally) the oil and gas lessor retains the rights to the use of the surface of the land insofar as they can be exercised

without interfering with the lessee's operations, a reversionary interest in any oil left over when the lease terminates, and a right to receive royalties on the oil produced under the lease. Foertsch v. Schaus, supra, 477 N.E.2d at 571; Carrigan v. Exxon Co. U.S.A., 877 F.2d 1237, 1242 (5th Cir. 1989); Krone v. Lacy, 97 N.W.2d 528, 533 (Neb. 1959); 3A W.L. Summers, The Law of Oil and Gas sec. 572, p. 8 (1958). Missing is any right to demand that the lessee leave his wells in working condition for the benefit of the lessor when the lease expires. In the absence of an express condition in the lease, that is not a right retained by the lessor when he grants an oil and gas lease. Hardy v. Heeter, supra, 96 N.E.2d at 684; Smith v. Mesel, supra, 84 N.E.2d at 478; Perry v. Acme Oil Co., 88 N.E. 859, 861 (Ind. App. 1909). This is one respect in which oil and gas law differs from standard property law; the default rule is that the fixtures belong to the lessee, not, as in the case of standard property law, to the lessor. And anyway there was an express right-to-remove clause, as we have seen. So when in 1956 the owner of the oil and gas estate in the 400-acre tract purported to reserve a right to demand restoration of any oil wells removed from the property, he was reserving a right that he did not have; it was not one of the rights he had retained in granting the 1949 oil lease. And so when Youngs obtained the oil and gas estate in 1975 he did not obtain a right to demand the restoration of oil wells on the property. The 1949 lease had given Bouchie carte blanche to deal with the oil wells. They were his to remove, abandon, sell, or demolish, as he wanted, subject only to a statutory duty to cap nonproducing wells. Ind. Code sec. 14-37-8-1; Jarvis Drilling, Inc. v. Midwest Oil Producing Co., 626 N.E.2d 821, 826-28 (Ind. App. 1993).

Youngs is attempting to enforce against Old Ben a right that belongs to Bouchie. Only if Bouchie had abandoned the wells to Youngs could Youngs have complained about Bouchie's agreeing with Old Ben to demolish the wells. The principle of oil and gas law that defeats Youngs's suit by denying that a right of restoration is a part of the oil and gas estate prevents the interference with a previous lease that we said would be caused if the lessor could, by a subsequent lease,

deprive the previous lessee of the right to assign his right of removal. That is what Bouchie did in effect when he agreed with Old Ben to destroy the wells.

There is still more that is wrong with Youngs's claim. The restoration clause requires the restoration of the wells "to production." The implication is that there is still recoverable oil in the ground--otherwise there will be no production from the restored wells. The evidence is uncontradicted that these wells produced their last oil no later than March 1989; and production had been declining steadily for years. Maybe a few more drops could be squeezed out by heroic efforts, but production commensurate with the expense of restoring wells that have been completely demolished--all surface facilities and pipe removed and the wells themselves plugged with cement--was out of the question. Youngs claims that the issue of production is not before us, but he is wrong; Old Ben made it an issue in the district court, and Youngs never tried to present contrary evidence. Thus we can infer that the object of this suit is not to get Old Ben to restore the wells but to force Old Ben to pay its way out of the duty of restoration. Since the wells were no longer producing when they were destroyed, there is still another argument against Youngs: the obligation to restore is conditional on the wells' having been taken out of production, and they were not.

The exhaustion of the oil suggests a deeper objection to the suit, one that does not depend on the words "in production" or "out of production." The objection can be illustrated with the facts of the well-known case of Groves v. John Wunder Co., 286 N.W. 235 (Minn. 1939). The defendant as part of a larger deal with the plaintiff promised to level land owned by the latter, and broke his promise. But because the Great Depression had intervened between the making of the agreement and the defendant's refusal to carry it out, the cost of leveling the land--$60,000--would have greatly exceeded the value of the land after it was leveled--$12,000. Nevertheless the plaintiff sued for, and won, the expense of leveling, on the theory that he had bargained for leveling come what may. The analogy to the present case is evident:

Youngs is asking Old Ben to bear the cost of restoring wells that when restored will have no value. But Groves is not the law in Indiana. City of Anderson v. Salling Concrete Corp., 411 N.E.2d 728, 731-34 (Ind. App. 1980); see also Peevyhouse v. Garland Coal & Mining Co., 382 P.2d 109 (Okla. 1962); 3 E. Allan Farnsworth, Farnsworth on Contracts sec. 12.20c, p. 356 and nn. 17-18 (1990). Because the value of the plaintiff's land had fallen, the breach of contract did not actually impose any loss on him, and the only proper remedy for a harmless breach is nominal damages. The effect of the award of damages was to shift from the owner of the land to the contractor a part of the risk of the fall in land values caused by the Depression. One expects the risk of a fall of the value of land to be borne by the owner of the land rather than by a contractor. It is the same here. Breach of a duty to restore the wells to their mint operating condition would impose no loss on the owner of the oil and gas estate in the land (Youngs), because there is no oil left in the ground and so no value to be obtained from oil wells. And one would expect the risk of the oil running out to be borne by the owner of the oil and gas estate, who has the reversionary interest in any oil that is left after the oil lease has terminated, rather than by a coal company. The owner of the oil and gas estate gains if there is oil left in the ground after the oil lease runs out, and so he should lose if there is no oil left.

This case is actually worse for the plaintiff than Groves, because Youngs is seeking, but not wanting, specific performance. If he obtained the relief he is seeking, that would just be a prelude to a further negotiation with Old Ben. Youngs does not want nonproducing wells; he wants money to compensate him for a loss that he has not sustained, since the restoration of the wells would have value for him only if there were oil left in the ground. The essentially extortionate transaction, a source of transaction costs not offset by any social benefit, for which an order of specific performance would have set the stage is another compelling objection, though less to the claim underlying the suit than to the relief sought, the grant of which would be inequitable. Walgreen Co. v.

Sara Creek Property Co., 966 F.2d 273, 276 (7th Cir. 1992); Goldstick v. ICM Realty, 788 F.2d 456, 463 (7th Cir. 1986); Milbrew, Inc. v. Commissioner, 710 F.2d 1302, 1306-07 (7th Cir. 1983); Chicago & North Western Transportation Co. v. United States, 678 F.2d 665, 667-68 (7th Cir. 1982). Were there a right of specific performance and to lost oil revenues because of the failure to restore the wells, then Youngs could obtain damages as well; but neither premise is supported.

On multiple grounds, then, the district court was right to give judgment for Old Ben and dismiss the suit.

Affirmed.